Andrea DRIVER, Plaintiff-Appellant,

v.

HOUSING AUTHORITY OF RACINE COUNTY,
Defendant-Respondent.
[Case No. 2005AP410.]

Dorothy BIZZLE, Plaintiff-Appellant,

v.

HOUSING AUTHORITY OF RACINE COUNTY,
Defendant-Respondent.
[Case No. 2005AP411.]

Court of Appeals

*Nos. 2005AP410, 2005AP411. Oral argument January 4, 2006.
—Decided February 8, 2006.*

2006 WI App 42

(Also reported in 713 N.W.2d 670.)

728

730

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *Gai A. Lorenzen* and *Jeffery R. Meyer* of *Legal Action of Wisconsin, Inc.*, of Racine, and *Melissa A. Frost* of *Leece & Phillips, S.C.* of Elkhorn. There was oral argument by *Jeffery R. Meyer*.

On behalf of the defendant-respondent, the cause was submitted on the briefs of *Jan M. Schroeder* and *Ahndrea R. Van Den Elzen* of *Peterson, Johnson & Murray, S.C.* of Milwaukee. There was oral argument by *Jan M. Schroeder*.

Before Snyder, P.J., Brown and Anderson, JJ.

¶ 1. BROWN, J. The plaintiffs appeal the circuit

court's dismissal of their 42 U.S.C. § 1983 (2005)[1] actions against the Housing Authority of Racine County (HARC). HARC sent both plaintiffs a notice stating it would terminate their section 8[2] housing assistance benefits because they had violated a "family obligation." Each party requested and received an informal hearing, after which HARC issued a written decision terminating the party's assistance for violating a "tenant responsibility." The circuit court granted summary judgment for HARC on the ground that both plaintiffs had actual knowledge of the charges against them. We reverse. Both the initial notices and the ultimate decisions, essentially form letters, fell woefully short of the level of specificity that due process requires. Nowhere did these documents specify *who* had violated *what* specific obligation and *when* the violation occurred, and neither gave even a rudimentary description of the incidents giving rise to the charges. "Actual notice" will not suffice. Federal regulations mandate *written* notice, and strict compliance is imperative as a matter of law and public policy. By reading an "actual notice" exception into the regulatory scheme, we would invite housing authorities to dispense with proper notice whenever they determined for themselves that the tenant "must have known" the basis for the allegations against them. Tenants would have no recourse unless they could prove, based on a record that may be sparse or nonexistent, that they did not actually have such notice. Fundamental fairness does not countenance such a result.

---

[1] All United States Code references are to the 2005 version unless noted otherwise.

[2] *See* United States Housing Act of 1937, § 8, 42 U.S.C. § 1437f.

### Driver's Case

¶ 2. In August 2003, the police arrested Andrea Driver for some robberies that she had allegedly committed with her friend, Shauna Stilo. Becky Getman, a HARC employee, sent Driver a letter while she was in jail advising Driver that she had some information on her housing status. Getman had apparently received a telephone call informing her that Stilo was living at Driver's address. Driver called Getman when she got out of jail and arranged to meet with her. At the meeting, Getman asked for copies of the police records relating to the charges. She warned Driver that engaging in violent criminal activity constituted a violation of Driver's family obligations and could result in termination of her section 8 housing assistance.

¶ 3. On February 27, 2004, Driver received a letter that stated in pertinent part, "Your eligibility to participate in the Section 8 Rental Assistance Program will terminate . . . for the following reason(s): You violated your family obligation under the Section 8 Rental Assistance Program." Driver called Getman to inquire why she was being terminated. Getman informed her the reason was violating her family obligations, by which she meant that Driver had another individual living with her. Driver requested an informal hearing in writing, stating "I writing [sic] to request an informal hearing in regards to my being terminated due to family obligations[.] Shauna Stilo does and has not lived with me[.] I can prove it with documents. If she used my address it was not of my knowledge." A hearing was granted and took place on March 9.

¶ 4. Although we have a minimal record before us, the parties appear to agree that the following occurred at the hearing. First, Getman announced that

the reason for the hearing was that Stilo was staying at Driver's address in violation of Driver's family obligations. The exhibits included Driver's housing voucher, which set forth the family obligations, several documents Driver signed that reiterate those obligations, and the police reports relating to the robbery. The reports Getman brought listed Stilo's address as Driver's residence. Driver brought other police reports, some of which indicated a different address for Stilo. Driver also called her aunt to testify that Stilo did not live with her. In addition, Stilo's Wisconsin ID card was marked as an exhibit.

¶ 5. Following the hearing, Driver received the results of the informal hearing in a letter reading in relevant part, "[HARC] has concluded its review[] of the information you provided and ha[s] found no extenuating circumstances to explain why you were unable to comply with your tenant responsibilities as a recipient of the Section 8 Program . . . . It is the finding of the Authority that you violated your tenant responsibility and . . . your assistance is being terminated." Driver asked HARC to reconsider, stating that she had additional proof that Stilo did not live with her. HARC denied the request, and she brought a 42 U.S.C. § 1983 claim in the circuit court.

¶ 6. Both parties moved for summary judgment. At the motion hearing, Driver's counsel conceded that actual or oral notice of HARC's grounds for termination sufficed and that Driver had such notice. Specifically, she knew that the termination had to do with Stilo living at her address without HARC's authorization. The court granted HARC's motion and dismissed Driver's case. The court noted Driver's actual knowledge of the issues and that she had an opportunity to prepare for the hearing. It also stated that Driver's

letter to HARC asking for a new hearing demonstrated that she knew the reason for the ultimate decision.

**Bizzle's Case**

¶ 7. On March 7, 2004, Dorothy Bizzle's three sons, Sam, Richard, and Corey became involved in a dispute. Corey and Richard went outside, where Corey cut Richard with a knife, and the police got involved. Both Richard and Corey were arrested. On April 8, Bizzle received a form letter substantively identical to the one Driver received, stating, "[y]ou violated your family obligation under the Section 8 Rental Assistance Program," and informing Bizzle that her assistance would terminate. Bizzle called Getman, her caseworker, from an agency called Fair Housing to ask about the termination letter.

¶ 8. Getman's affidavit states that she informed Bizzle of the reason for the termination, namely, that she had violated her family obligation by allowing Corey to live with her and/or use her address. Only Sam was authorized to live with Bizzle. Getman states she advised Bizzle that she had verification of the violation in the form of a Department of Corrections (DOC) report and a police report. The Getman affidavit also reveals that HARC concluded from the police reports that Richard was living with Dorothy, which, if true, would constitute an independent violation of the "unauthorized persons" obligation. Getman further attests that she issued the termination for a third "family obligation" violation, namely, violent criminal activity on or near her unit. Bizzle sent Getman a letter requesting a hearing and a date for a past-due housing inspection.

¶ 9. The record reveals that at the hearing, Bizzle presented no evidence on her own behalf. Getman

read from the police reports and the DOC report and presented them to the hearing officer. The police reports revealed the knife fight between Richard and Corey and that both listed Bizzle's address as their own. The DOC report recorded a home visit Corey's probation officer had made to Bizzle's address, in which Corey told the officer he had just gotten home from work and had nothing new to report. Another DOC document stated that Corey had reported Bizzle's address as his home address since 2003. Getman also introduced several papers Bizzle had signed in which she agreed to observe certain family obligations. Bizzle admitted at the hearing that her children use her address when they go to jail but denied everything else.

¶ 10. After the hearing, Bizzle received a form letter substantively identical to the decision letter Driver received: "[HARC] has concluded its review and ha[s] found no extenuating circumstances to explain why you were unable to comply with your tenant responsibilities as a recipient of the Section 8 Program. It is the finding of the Authority that you violated your tenant responsibility and . . . your assistance is being terminated."

¶ 11. As in the *Driver* case, Bizzle brought a 42 U.S.C. § 1983 claim that resulted in cross-motions for summary judgment. Like Driver, Bizzle conceded at the motion hearing that she had actual notice and that such notice was adequate. She had admitted in her deposition that she knew the termination was related to Corey living at or using her address and to the fight her sons engaged in. The court granted HARC's motion based on Bizzle's actual knowledge of the pertinent claims and issues and Bizzle's own statements.

## Standard of Review

¶ 12. Both tenants appeal, contending that HARC failed to follow the proper procedural mechanisms called for by due process and the federal regulatory scheme. Because this case comes to us on summary judgment, our review is de novo, and we apply the same methodology as the circuit court. *See Green Spring Farms v. Kersten*, 136 Wis. 2d 304, 315–17, 401 N.W.2d 816 (1987). That methodology is well known, and we need not repeat it here. *See, e.g., Lambrecht v. Estate of Kaczmarczyk*, 2001 WI 25, ¶¶ 20–24, 241 Wis. 2d 804, 623 N.W.2d 751. Suffice it to say that summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to summary judgment as a matter of law. *Green Spring Farms*, 136 Wis. 2d at 315.

## Sufficiency of the Written Prehearing Notices

¶ 13. In *Goldberg v. Kelly*, 397 U.S. 254, 267–71 (1970), the United States Supreme Court recognized that due process mandates several safeguards prior to the government's termination of welfare benefits. In order to comply with due process, the individual must be given a meaningful pretermination hearing including the following safeguards:

> *(1) timely and adequate notice detailing the reasons for termination;* (2) an opportunity to appear personally at the hearing, present evidence and oral arguments and confront and cross-examine adverse witnesses; (3) the right to be represented by counsel; (4) a right to a decision rendered by an impartial decisionmaker; (5) a right to have that decision based solely on rules of law

737

and the evidence presented at the hearing; and (6) a right to a statement by the decisionmaker setting forth the reasons for the decision and the evidence upon which it was based.

*Ferguson v. Metropolitan Dev. & Hous. Agency*, 485 F. Supp. 517, 522 (M.D. Tenn. 1980) (emphasis added); *Goldberg*, 397 U.S. at 267–71, *cited in Ferguson*. The purpose of the pretermination hearing is to produce an initial determination of the validity of the government agency's grounds for discontinuance of benefits. *See Goldberg*, 397 U.S. at 267. Both parties recognize that the *Goldberg* requirements apply to the termination of section 8 benefits. *See also Edgecomb v. Housing Auth.*, 824 F. Supp. 312, 314 (D. Conn. 1993) (holding that termination of section 8 benefits must be judged by the standards in *Goldberg*); *Ferguson*, 485 F. Supp. at 522 (section 8 case; recognizing that "*Goldberg* . . . provides the essential standard for a hearing on termination of public assistance benefits relating to the livelihood and survival of the participant"); *Simmons v. Drew*, 716 F.2d 1160, 1162 (7th Cir. 1983) (comparing section 8 assistance to job tenure and recognizing it as a property right protected by the Fourteenth Amendment). The parties also appear to agree that the United States Department of Housing and Urban Development enacted the regulations pertinent to this case to codify and implement the *Goldberg* standards.

¶ 14. HUD regulations provide that a housing authority may terminate section 8 assistance if the family violates any family obligations under the program. *See* 24 C.F.R. § 982.552(c)(1)(i) (2005).[3] It must, however, give the family the option of an informal hearing because a termination on these grounds is

---

[3] All references to the Code of Federal Regulations are to the 2005 version unless otherwise noted.

based on the family's action or failure to act. *See* 24 C.F.R. § 982.555(a)(1)(v). The housing authority must apprise the participant family of the right to a hearing in a "prompt written notice" that also contains, among other information, "a brief statement of reasons for the decision." *See* § 982.555(c)(2)(i).

¶ 15. *Edgecomb* provides the most thorough discussion of the elements embodied in such a "brief statement." The court in that case began by noting the purpose of the written notice, "to inform the tenant of the allegations so that he can prepare a defense." *Edgecomb*, 824 F. Supp. at 314. In light of that purpose, the court concluded that the notice must be "sufficiently specific . . . to enable [the tenant] to prepare rebuttal evidence to introduce at his hearing appearance." *Id.* at 315 (quoting *Billington v. Underwood*, 613 F.2d 91, 94 (5th Cir. 1980)). In order to effectively rebut adverse evidence at the hearing, the notice must alert the tenant of the nature of this adverse evidence. *See Edgecomb*, 824 F. Supp. at 315; *Billington*, 613 F.2d at 94 (in order to properly safeguard against error in eligibility determinations for section 8 benefits, the housing authority must at a minimum apprise the rejected applicant of the following information about the adverse evidence in its "statement of reasons": the date, the source of the information—including the name and title of individuals contacted—and a resume of the information received).[4]

---

[4] Cases involving other forms of public assistance have reached comparable results. In *Gray Panthers v. Schweiker*, 652 F.2d 146, 168 (D.C. Cir. 1980), the D.C. Circuit underscored the uselessness of an evidentiary hearing in which the individual had inadequate prior notice of the evidence. "Without notice of the specific reasons for [the agency's action], a claimant is

¶ 16. *Edgecomb* found the notices at issue in that case deficient based on these standards. The plaintiff had given her brother a ride to the store when he came to visit her, and he had sold cocaine to two men in the parking lot. *Edgecomb*, 824 F. Supp. at 313. Several months later, the plaintiff received a notice that the housing authority intended to terminate her housing assistance. *Id.* The notice stated that the housing authority was terminating the plaintiff for "having engaged in drug-related criminal activity or violent criminal activity, including criminal activity by any family member." *Id.* at 315. The court reasoned that a proper notice would have stated the particular felony, specified the particular person alleged to have committed the felony, and contained a brief factual statement concerning the incident. *Id.* The form letter notices HARC issued to Driver and Bizzle clearly do not come within a country mile of the degree of specificity *Edgecomb* described.

**Sufficiency of the Written Decisions**

¶ 17. In addition to written notice of the pertinent allegations prior to the informal hearing, *Goldberg* also

reduced to guessing what evidence can or should be submitted in response and driven to responding to every possible argument against denial at the risk of missing the critical one altogether." *Id.* at 168–69. Similarly, in *Ortiz v. Eichler*, 616 F. Supp. 1046, 1061–62 (D. Del. 1985) (involving Medicaid, AFDC, and food stamp benefits), the court emphasized that where an agency's decision is based on the benefit recipient's conduct, the notice must "explain what the claimant was required to do and how his or her actions failed to meet this standard" so that the recipient can adequately ascertain the correctness of the agency's decision and prepare for the issues at a hearing.

requires that the decision maker state the reasons for its determination and indicate what evidence it considered in reaching its conclusion, although the decision need not amount to a comprehensive judicial opinion with formal findings of fact and legal conclusions. *See Goldberg*, 397 U.S. at 271; 24 C.F.R. § 982.555(e)(6) (requiring "a written decision, stating briefly the reasons for the decision"). *Cole v. Metropolitan Council HRA*, 686 N.W.2d 334, 338 (Minn. Ct. App. 2004), interpreted § 982.555(e)(6) to require a housing authority to "explain on what evidence it is relying and how that evidence connects rationally with its choice of action." Although formal findings of fact and conclusions of law are not necessary, the decision must contain at least a rudimentary explanation of the elements of fact or law on which the decision is actually based, so as to be truly informative as to why the housing authority reached the conclusion it did. *See Edgecomb*, 824 F. Supp. at 316. Bare and conclusory statements, therefore, will not suffice. *Id. Edgecomb* deemed the following explanation too conclusory to satisfy these standards: "there was a preponderance of evidence that indicated that a Family member did engage in such drug related activity while on the Section 8 program, which is a violation of [the pertinent regulation]." *Id.* at 316.

¶ 18. Both decision letters from HARC fall appallingly short of the mark. They contain no facts related to the incidents giving rise to the termination decisions and do not mention any specific evidence the hearing officers relied on. Moreover, they do not state the elements of law motivating the court's conclusion. Even if we ignore the absence of any factual background, the letters are deficient for the absence of any legal rationale. They cite no policy, regulation, or other authority

indicating what a "family obligation" is or how the plaintiffs' acts or omissions fail to meet the pertinent legal requirements.

### Irrelevance of "Actual Notice"

¶ 19. HARC contends that even if its written notices and decision letters failed to live up to *Goldberg* standards, the defects in these communications are cured by the parties' "actual notice" of the reasons for their termination. We recognize that the plaintiffs conceded both "actual knowledge" and the sufficiency thereof at the summary judgment hearing. However, we deem this concession ill-advised and contrary to law and public policy. *See A.O. Smith Corp. v. Allstate Ins. Cos.*, 222 Wis. 2d 475, 493, 588 N.W.2d 285 (Ct. App. 1998) (waiver rule purely administrative and not a bar to this court addressing issues if it so chooses). Thus, we will address the sufficiency of "actual notice."

¶ 20. We begin with the language of the implementing regulations. HUD expressly requires in 24 C.F.R. § 982.555(c)(2)(i) that a housing authority wishing to terminate section 8 benefits issue the recipient a "prompt *written* notice" of its proposed termination. (Emphasis added.) Similarly, § 982.555(e)(6) requires the housing authority to issue a "*written* decision" that states the basis for the termination. (Emphasis added.) We contrast this language with the wording of § 982.555(c)(1), the pertinent part of which reads, "In the cases described in paragraphs (a)(1)(i), (ii) and (iii) of this section [dealing with grounds for termination other than the recipient's acts or omissions], the [housing authority] must notify the family that the family may ask for an explanation of the basis of the ... determination." Whereas this latter section appears to

allow for "oral notice," its counterpart in subsection (c)(2) clearly mandates a different procedure. We need look no further than HUD's intent as evidenced by the regulatory language. *See State ex rel. Kalal v. Circuit Court for Dane County*, 2004 WI 58, ¶¶ 43, 45, 271 Wis. 2d 633, 681 N.W.2d 110 (where statute unambiguous, we go no further than its plain meaning).

¶ 21. In *Morales v. McMahon*, 272 Cal. Rptr. 688, 691–92 (Ct. App. 1990) (involving reduction of welfare benefits), the appellate court reached a similar result. *Morales* observed that the applicable regulation defined "adequate notice" as "*written* notice" and "provide[d] no exceptions for oral notice or constructive notice." *Id.* at 691. Thus, the court held that regardless of whether *Goldberg* might allow for "actual or constructive notice," the regulatory scheme contemplated "an arguably higher standard of 'what process is due.' " *Morales*, 272 Cal. Rptr. at 692 & n.5.

¶ 22. In addition to the foregoing, public policy mandates strict compliance with the written notice requirement. First, due process imposes the burden of providing adequate notice on the *government*, not on the individual. *See Ortiz v. Eichler*, 616 F. Supp. 1046, 1062 (D. Del. 1985) (involving Medicaid, AFDC, and food stamp benefits). Other courts have, on due process grounds, deemed written notices that merely inform the benefit recipient of the opportunity to discover the reason for the termination to be improper because they effectively relieve the government of that burden. *Id.*; *Morales*, 272 Cal. Rptr. at 692; *see also Vargas v. Trainor*, 508 F.2d 485, 489–90 (7th Cir. 1974) (terminations of public assistance benefits to aged, blind and disabled individuals). The court in *Vargas* cogently observed:

Even if the cases were not read to impose so categorical a requirement [referring to written notice], the notice in this case would fail to meet the requirements of due process. The notice is addressed to persons who are aged, blind, or disabled, many of whom, defendant could have anticipated, would be unable or disinclined, because of physical handicaps and, in the case of the aged, mental handicaps as well, to take the necessary affirmative action . . . . Under such a procedure only the aggressive receive their due process right to be advised of the reasons for the proposed action. The meek and submissive remain in the dark and suffer their benefits to be reduced or terminated without knowing why the Department is taking that action.

*Vargas*, 508 F.2d at 489–90; *see also Ortiz*, 616 F. Supp. at 1062 (citing *Vargas*); *Morales*, 272 Cal. Rptr. at 692.

¶ 23. Although *Morales*, *Ortiz*, and *Vargas* focused primarily on the inadequacy of constructive notice, we conclude that recognizing an "actual notice" exception to the regulatory scheme would, in practice, amount to the same thing. Because of the informality surrounding the pretermination hearing process, courts may have little or no record upon which to ascertain the sufficiency of oral or other actual notice. Such is the case here. We have no records of the administrative proceedings in the Bizzle and Driver matters from which to ascertain how much the plaintiffs knew about the claims against them, and what little we can piece together we derive from deposition testimony, affidavits, and representations the parties made at the summary judgment hearing. Faced with such a sparse record, a section 8 recipient who attempts to establish that he or she did not receive oral notice faces a nearly insurmountable task. Courts would likely infer actual notice in many cases from the mere opportunity of the plaintiff to discover the pertinent infor-

mation (i.e., constructive notice) combined with the housing authority's assertion that he or she in fact exercised that opportunity, at which time it provided oral notice. Thus, an "actual notice" exception would not adequately protect a section 8 recipient's property right in his or her benefits. *Cf. University Sav. Ass'n v. Springwoods Shopping Ctr.*, 644 S.W.2d 705, 706 (Tex. 1982) ("The reason that 'strictness' is required in following the terms of the power granted by the deed of trust is to protect the property of the debtor."); *Hawkins v. Bruno Yacht Sales, Inc.*, 536 S.E.2d 698, 705–06 (S.C. Ct. App. 2000) (strict compliance with statutory requirements necessary prior to a tax sale, even if taxpayer has "actual notice"), *modified on other grounds and aff'd*, 577 S.E.2d 202 (S.C. 2003).

¶ 24. Moreover, we do not want to invite noncompliance with the regulatory requirements. If we recognize an "actual notice" exception, we can foresee housing authorities bending the rules and providing deficient written communications whenever they satisfy themselves that the section 8 recipient must "already know" the basis for its termination decision. Such a self-serving conclusion, of course, improperly presupposes that the tenant has committed some violation of which he or she must already be aware.

¶ 25. Although we emphasize that only strict compliance will suffice, we note that if we did recognize an "actual notice" exception to the regulatory requirement of written prehearing notices and final decisions, such notice would have to be essentially an oral replica of the information *Edgecomb* requires a written communication to contain. Specifically, the housing authority would have to inform the tenant *who* committed the violation, based on *what conduct, when* the incident occurred, *what* policies or rules the conduct violates,

*how* the conduct fails to comply with section 8 rules or policies, and *what evidence* the housing authority has that leads it to believe that the described violation occurred. Again, due process requires such information in order for the tenant to adequately prepare for the hearing and to understand what factors motivated the final decision, particularly where more than one potential ground for termination exists.

¶ 26. The "actual notice" the plaintiffs conceded here would fall short of these due process standards. Driver obviously knew that the grounds for termination had something to do with the fact that HARC believed Stilo was living at her apartment. HARC did not challenge opposing council's representation at oral argument that tenants may have guests, even overnight guests, for periods not exceeding twenty-one days. In response to the court's inquiry as to what twenty-one day period Stilo allegedly overstayed her welcome, however, HARC had no answer. HARC also did not challenge opposing council's assertion that the police reports offered at the hearing—if we presume their contents to be true—conclusively establish only that Stilo had stayed at Driver's address for a period of thirteen days. Although the twenty-one day time period is obviously decisive with respect to whether a "family obligation" violation occurred, even HARC appears to be in the dark about how it established this crucial factor. We cannot imagine that Driver would know better than HARC why HARC terminated her assistance.

¶ 27. Turning now to the Bizzle matter, we note that Getman attested to the fact that before the hearing, she informed Bizzle that she was being terminated

because "Corey Bizzle was living with her and/or using her address in violation of her family law obligation." We have two problems with this oral notice. First, it is obvious from the record that HARC considered "using the address" to mean something other than "living at the address." HARC's counsel referred to Bizzle's admission at the informal hearing that when her children go to jail, they use her address. Near as we can tell, this violation involves someone other than the tenant listing the tenant's address as either a mailing address or a place of residence. Of what HARC policy or regulation this conduct constitutes a violation remains a mystery. HARC does not refer to any HUD regulation. Moreover, although throughout these proceedings HARC has referred to several documents in the record—which Bizzle signed and which enumerate various rules she must follow—as sources of "family obligations," none of these documents indicates the existence of a "using the address" violation.

¶ 28. Notwithstanding the fact that HARC cites no authority for the proposition that someone else's use of Bizzle's address violates a family obligation, the circuit court dismissed Bizzle's action in part *because of* her admissions that her children used her address when they went to jail. We presume that HARC would not have mentioned Bizzle's admission had it not provided at least part of the basis for its ultimate decision to terminate benefits; that fact would otherwise have been irrelevant. HARC's implicit concession that it terminated benefits partially on the basis of the "using the address" violation dooms its case. Again, due process requires a housing authority to reveal *why* the tenant's conduct constitutes a violation.

¶ 29. Moreover, at the summary judgment hearing, the parties appeared to agree that the violations of which Bizzle had been apprised involved *Corey* living at "and/or using her address" and the violent criminal activity involving the knife fight between Richard and Corey. Yet, Getman's affidavit indicates that it also considered *Richard* to be an unauthorized person living with Bizzle or using her address. HARC does not dispute that at the informal hearing Getman raised concerns about Richard as an unauthorized person. HARC's implicit concession that its ultimate decision took into account Bizzle's admission that her *children* (presumably meaning more than one child) use her address when they go to jail, raises serious concerns that HARC did not inform Bizzle of all grounds upon which its termination rested; even if we assume that HARC based its termination only on Corey's residence/use of the address and the knife fight, the fact that other possible grounds for termination came to light at the hearing renders HARC's final decision to terminate benefits fatally ambiguous. Thus, it appears that to the extent Bizzle had "actual notice" of HARC's claims, this notice was incomplete.

¶ 30. We reverse. Neither Driver nor Bizzle received adequate notice of HARC's reasons for terminating assistance because the written communications were not specific enough to satisfy due process requirements. Because the regulatory scheme expressly requires written notice and written decisions, we look only to these documents and not to other forms of notice. Indeed, reading an "actual notice" exception into the HUD regulations would raise serious public policy concerns, as it would invite housing authorities to disobey the regulations whenever they deemed a tenant to have actual knowledge of what he or she did wrong

and would effectively shift the burden of ascertaining the basis of the termination decision to the tenant. Tenants who had "constructive notice," moreover, would often be deprived of their property without redress because sparse or nonexistent records would preclude them from disproving the housing authority's assertion that it gave the tenant actual notice. Moreover, even were we to allow an "actual notice" exception, it would have to be oral notice that contained all of the specific information that *Edgecomb* mentioned. Neither party received such notice here.

¶ 31. We also remand these cases to the circuit court to determine the appropriate remedy. In part, this remedy will include an injunction commanding HARC to obey due process and regulatory requirements. The court shall also determine what damages Bizzle and Driver deserve for the improper deprivation of their housing assistance benefits. Finally, the court should explore the possibility of getting both tenants back onto the section 8 program.

*By the Court.*—Orders reversed and cause remanded with directions.