**Malinda COLON, et al., Plaintiffs**

v.

**John WAGNER, Defendant.**

**Civil Action No. 06–30166–MAP.**

United States District Court,
D. Massachusetts.

Nov. 17, 2006.

---

Janice A. Healy, Attorney General's Office, Springfield, MA, James S. Whitcomb, Office of Attorney General, Springfield, MA, for Defendant.

Marion Hohn, J. Paterson Rae, Springfield, MA, Faye B. Rachlin, Legal Assistance Corporation of Central Massachusetts, Worcester, MA, J. Peterson Rae, Western Mass. Legal Services, Springfield, MA, for Plaintiffs.

*MEMORANDUM AND ORDER REGARDING PLAINTIFFS' MOTIONS FOR INJUNCTIVE RELIEF AND CLASS CERTIFICATION*

PONSOR, District Judge.

## I. *INTRODUCTION*

This is a proposed class action brought by Plaintiffs Malinda Colon ("Colon") and Latisa Gasque ("Gasque") on behalf of all persons in the Commonwealth of Massachusetts who have been, are being, or will be provided emergency shelter benefits by the Department of Transitional Assistance (the "Department" or the "DTA") and who within the last twelve months have been or in the future will be sent notices of termination of those shelter benefits by Defendant John Wagner, Commissioner of the DTA. Plaintiffs allege that the form notices utilized by Defendant fail to provide sufficient detail concerning the basis for their terminations. They therefore seek an order: (1) enjoining Defendant from terminating the shelter benefits of any current or future recipient without first providing that recipient with a notice that satisfies the Due Process Clause of the Fourteenth Amendment; (2) requiring Defendant to turn over all termination notices issued during the pendency of this action; and (3) requiring Defendant to send a notice informing individuals whose shelter benefits have been recently terminated that they may re-apply for such benefits notwithstanding the customary twelve-month disqualification rule. Plaintiffs also seek an order certifying a class of plaintiffs outlined above.

Defendant opposes Plaintiffs' motion for injunctive relief on the grounds that: (1) the cumulative written notices the purported class members received contained sufficient detail to enable them to contest their terminations; (2) the DTA's recent modification of its termination notice form, adding space for the description of the incidents giving rise to the termination determination, eliminates any due process concern; and (3) there is no evidence that the families who received the former notice forms are in danger of suffering irreparable injury, as almost all of them are still in shelters or have found feasible alternative housing. Defendant also opposes the certification of any class.

For the reasons set forth below, the court will: allow in part and deny in part Plaintiffs' motion for a temporary restraining order and/or preliminary injunction (Dkt. No. 6); and allow Plaintiffs' motion for class certification (Dkt. No. 10).

## II. *FACTS*

### A. *Statutory and Regulatory Background.*

The Emergency Assistance program, administered by the DTA, provides shelter benefits to otherwise eligible homeless families with dependent children and pregnant women with no children who have no other feasible alternative housing. Pursuant to state regulations, the DTA will terminate an individual's emergency shelter benefits the first time he or she: is asked to leave a shelter because there is reasonable cause to believe that a member of the household has engaged in criminal activity that threatens the health, safety and/or security of the individual or another; fails to appear at a designated placement without good cause; refuses an available placement; abandons a designated placement; finds feasible alternative housing; or becomes categorically or financially ineligible for emergency assistance benefits. 106 C.M.R. 309.040(F)(1)(a), (c)-(f).

In addition, the DTA will issue a written warning the first time a recipient of emergency shelter: (a) fails to attend a scheduled family shelter interview; (b) is refused admittance to a shelter due to unreasonable behavior at the interview; (c) fails to participate in activities required by the individual's so-called "self-sufficiency" plan; (d) rejects an opportunity for safe, permanent housing; (e) accumulates three or more violations of shelter rules; or (f) poses a threat to the health or safety of the recipient's self or others (for reasons other than engaging in criminal activity). 106 C.M.R. 309.040(E)(1), 106 C.M.R. 309.070(A)(3). If an individual continues to engage in any of the above conduct after receiving a written warning, the DTA will terminate the individual's emergency shelter benefit. 106 C.M.R. 309.040(F)(1)(b).

When the Department proposes to terminate a shelter benefit, it must provide a written notice setting forth the basis for the termination. When the termination arises from criminal activity or misconduct subsequent to a written warning, the DTA utilizes a Notice of Termination of Emergency Shelter ("NFL–ST") form. When the termination is due to a recipient's failure to appear at a designated placement, refusal of an available placement, abandonment of a designated placement, finding feasible alternative housing, or becoming ineligible for emergency assistance benefits, *i.e.* for reasons set forth in 106 C.M.R. 309.040(F)(1)(c)-(f), the Department uses an "NFL–9" form.

In August, 2006, the Department revised the portion of its NFL–ST form pertaining to criminal activity by adding two blank lines for a description of the incident and one blank line to identify the individual or individuals involved. (*See, e.g.,* Dkt. No. 8, Ex. A, Colon Termination Notice.) These revisions were transmitted by a field operations memorandum, which instructed local office workers to complete the NFL–ST by: "putting a check mark in the box next to the 'criminal activity' paragraph; writing the name of the [household] member who is engaging in or has engaged in the criminal activity; and writing a description of the criminal activity that is causing the termination of shelter benefits." (Dkt. No. 25, Ex. C, Field Operations Memo 2006–32, at 2 (Aug. 1, 2006) ("The precise description ... must state the action that is considered a criminal activity" and give the household member "information needed to prepare a defense to the allegations.").)

On October 19, 2006, approximately three weeks after Plaintiffs filed their complaint, the Department again revised the NFL–ST form by adding six blank lines for the date and description of the conduct

giving rise to the termination, as well as a blank line for the names of the household members who engaged in the proscribed acts. This second set of revisions was transmitted by a field operations memorandum that instructed DTA workers to use the blank lines to provide the particular reason for a termination, "such as failure to get a job, failure to do housing search, failure to meet with Housing Search Worker, etc." (Dkt. No. 20, Ex. 1, Field Operations Memo 2006–50, at 2 (Oct. 19, 2006) ("If the noncompliance is for not following three or more shelter rules, each of the violations that resulted in the determination of noncompliance must be included as well as the date of each violation.").)

### B. *Malinda Colon.*

Plaintiff Malinda Colon suffers from depression, sleep disorder, headaches, and loss of memory, and has been found disabled by DTA doctors. (Dkt. No. 8, Colon Aff. ¶ 5.) She and her two children began living at the Broderick House Shelter in Holyoke on July 7, 2005. (*Id.* ¶ 1.)

On September 8, 2006, the DTA sent an NFL–ST to Colon informing her that her shelter benefits would end on September 19, 2006. Three checked boxes on the notice indicated that Colon "did not comply with one or more of the temporary shelter requirements for a second time by . . . not

participating in the activities in [her] self-sufficiency plan" [1] and by "posing a threat to the health and/or safety of [herself], other guests, and/or the staff of the temporary shelter." (Colon Termination Notice (citing 106 C.M.R. 309.040(F)(1)(b), 106 C.M.R. 309.040(E)(1)(c), and 106 C.M.R. 309.040(E)(1)(f)).)

The termination notice did not specify the dates, times, or nature of the misconduct in question, and Colon maintains that reading the notice did not help her understand why her emergency shelter benefits were being terminated. (Colon Aff. ¶ 3 ("I guessed that one reason [for the termination notice] may have been that I offered my August savings to the shelter on September 1, 2006 instead of August 31, 2006 . . . .").)

According to Defendant, Colon received a written notice from the Broderick House on August 2, 2005, informing her that she had broken one of the shelter's rules by failing to save half of her monthly income. (Dkt. No. 22, Inserra Aff. ¶ 11.) After the shelter issued this warning, the Department worker assigned to Colon referred the matter to the DTA's non-compliance committee, requesting that Colon be given a written warning. (*Id.* ¶ 13.) Colon subsequently received such a warning, which notified her that she had not participated

---

1. "Self-sufficiency plans" are generated by DTA representatives, shelter staffpersons, housing assistance program workers, and adult members of households receiving emergency assistance. Each plan is supposed to contain activities that, if performed, will result in the household finding safe, permanent housing. These activities include, but are not limited to:

(a) cooperating with housing assistance program services by actively looking for safe, permanent housing . . .; (b) attending all scheduled meetings with the assigned housing assistance program worker; (c) meeting with the Department representative and the housing assistance program

worker; (d) planning the short-term or long-term goals associated with maintaining permanent housing; (e) providing proof of applications for public and subsidized housing and cooperating in providing needed documentation for public or subsidized eligibility determinations; . . . (f) providing documentation as specified by the Department of efforts to obtain safe, permanent housing in the public and private market[; and] (g) resolving any outstanding default or arrest warrants by any court of the Commonwealth of Massachusetts.

106 C.M.R. 309.040(D)(2). (*See also* Dkt. No. 22, Inserra Aff. ¶ 5.)

in the activities required by her self-sufficiency plan and informed her that another instance of noncompliance would result in the termination of her emergency shelter benefit. (*Id.* ¶¶ 14–15.)

Approximately one year later, on August 14, 2006, Broderick House gave Colon a second written warning when it discovered that she and her daughter had suffered their fourth bout of head lice, a condition that, according to the shelter, jeopardized the other families living there. (*Id.* ¶ 17.) Colon's case agent once again referred the matter to the noncompliance committee, requesting that Colon's emergency shelter benefit be terminated. On September 7, 2006, the noncompliance committee notified the local Department office of its decision to issue Colon an NFL–ST.

Colon responded by challenging her termination and remained at the Broderick House while her administrative appeal was pending. (*Id.* ¶ 24.) However, on October 3, 2006, two days before her scheduled hearing, Colon withdrew her request for a hearing, stating that she was no longer in need of emergency shelter. (Dkt. No. 22, Ex. 6, Letter from Marion Hohn, Atty., W. Mass. Legal Servs., to DTA Div. of Hearings (Oct. 3, 2006).)

## C. *Latisa Gasque.*

Plaintiff Latisa Gasque suffers from depression and has been living with her daughter at the Prospect House Shelter in Springfield since March 21, 2006. (Dkt. No. 9, Gasque Aff. ¶¶ 1, 4.) On September 14, 2006, the Department sent an NFL–ST to Gasque informing her that her shelter benefits would end on September 24, 2006. Like the notice Colon received, Gasque's notice came with three checked boxes, which indicated that Gasque "did not comply with one or more of the temporary shelter requirements for a second time by ... not participating in the activities in

[her] self-sufficiency plan" and by "posing a threat to the health and/or safety of [herself], other guests, and/or the staff of the temporary shelter." (Dkt. No. 9, Ex. A, Gasque Termination Notice (citations omitted).)

In addition, the notice contained the handwritten word "savings" next to the self-sufficiency plan violation and the handwritten phrase "toward 3 year old daughter" beneath the safety violation. (*Id.*) The termination notice did not specify the dates, times, or nature of the misconduct in question, and Gasque claims that reading the notice did not foster an understanding as to why her emergency shelter benefits were being withdrawn. (Gasque Aff. ¶ 3 ("When I got the termination notice I did not understand what it was about. I initially thought it was for not saving money but I did not know for what month or months the Department said I did not save. I was also confused as to what the alleged 'threat to health and safety' was.").)

According to Defendant, Prospect House issued Gasque a written warning on April 4, 2006 for breaking a rule that requires residents of the shelter to do a daily chore. On May 16, 2006, Prospect House issued Gasque a second written warning for failing to abide by the shelter's 8 p.m. curfew. The following day, May 17, 2006, Prospect House issued a third written warning for Gasque's use of inappropriate language in her dealings with shelter staff. (*See* Insera Aff. ¶ 26 (characterizing the absence of Gasque's initials on any of these notices as evidence that Gasque refused to acknowledge the infractions).)

After Gasque accumulated these first three shelter warnings, the Department worker assigned to her case referred the matter to the DTA's noncompliance committee and requested that Gasque be given a warning of noncompliance. On May 26,

2006, the Department issued such a warning, notifying Gasque that another instance of noncompliance would result in the termination of her emergency shelter benefit.

On July 29, 2006, Prospect House issued Gasque a written warning for leaving her three year-old daughter unattended. The following day, Prospect House issued another warning to Gasque for failing to do her daily chore or clean her room. On August 27, 2006, Prospect House issued yet another written warning to Gasque for breaking a shelter rule requiring residents to have their children in bed by a certain hour.

Gasque's case agent subsequently referred the matter to the DTA's noncompliance committee, recommending that Gasque's emergency shelter benefit be terminated. On September 13, 2006, the noncompliance committee notified the local Department office of its decision to issue Gasque an NFL–ST.

Gasque appealed the termination notice. In a decision dated October 13, 2006, Hearing Officer Mary C. Morrisey denied Gasque's appeal based on her finding that Gasque had left her three year-old daughter alone from 4:45 a.m. to 10:45 a.m., which violated shelter rules and posed a threat to the health and safety of the child.[2]

### D.  *Other Recipients of NFL–ST Forms.*

According to Defendant, in the last thirteen months, the Department issued NFL–STs to 180 families in Massachusetts. As of October 1, 2006, thirty of these families were in public or subsidized housing; ninety-nine were in private housing; thirty-nine were in emergency assistance shelters; five had moved out of Mas-

sachusetts; and the whereabouts of seven was unknown.

### E.  *Recipients of NFL–9 Forms.*

At this point, it is unclear how many NFL–9s the Department has issued in the last year. However, during oral argument on October 25, 2006, Plaintiffs' counsel stated that in five years of representing homeless families seeking to preserve emergency shelter benefits she has encountered more NFL–STs than NFL–9s.

Apparently, Defendant has not revised the NFL–9 form since August, 2005. (*See* Dkt. No. 39, Ex. 1, Pls.' Am. Compl., Ex. C, Schaub Termination Notice.) None of the recent revisions to the NFL–ST form, incorporating space to set out the specifics of alleged infractions, has been made on the NFL–9 form.

## III.  *DISCUSSION*

### A.  *Plaintiffs' Motion for Injunctive Relief.*

■ In determining whether a preliminary injunction should issue, a court must consider:

(1) the likelihood of success on the merits; (2) the potential for irreparable harm [to the movant] if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest.

*Esso Standard Oil Co. (P.R.) v. Monroig–Zayas,* 445 F.3d 13, 17–18 (1st Cir.2006) (citation omitted); *see also Air Line Pilots Ass'n, Intern. v. Guilford Transp. Indus., Inc.,* 399 F.3d 89, 95 (1st Cir.2005) (designating "likelihood of success" the "sine qua

---

**2.**  The Department has continued to provide temporary emergency shelter benefits to Gas-

que pending this court's resolution of Plaintiffs' motions.

non to preliminary injunctive relief" (citation omitted)).

▊ Plaintiffs assert that they are likely to prevail on the merits of their due process claim given the absence of individualized information found on Defendant's form notices.[3] "The purpose of notice under the Due Process Clause is to apprise the affected individual of, and permit adequate preparation for, an impending 'hearing.'" *Mard v. Town of Amherst*, 350 F.3d 184, 189 (1st Cir.2003) (quoting *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 14, 98 S.Ct. 1554, 56 L.Ed.2d 30 (1978)). In the context of a proposed termination of public assistance, it is well-settled that due process requires "that a recipient have timely and adequate notice detailing the reasons for [the] proposed termination." *Goldberg v. Kelly*, 397 U.S. 254, 267–68, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970).

Plaintiffs' claim for injunctive relief may be usefully broken into two segments: (1) a claim for a remedy covering persons terminated in the last year via the allegedly defective forms; and (2) a claim for relief regarding termination notices to be used in the future.

### 1. *Retrospective Relief.*

To establish their right to some form of retrospective injunctive relief, Plaintiffs must show that the notices they received failed to afford them a reasonable opportunity to prepare and present evidence and opposing argument at a termination hearing.

▊ Defendant takes the position that the NFL–ST is the culmination of a long series of warnings issued by a shelter and the Department. Placed in this context, Defendant submits, the NFL–ST, in all its permutations, has always given recipients the information they need to present their side of the story. *See Goldberg*, 397 U.S. at 268, 90 S.Ct. 1011 (finding system that conveyed notice by combination of written notice and oral conference satisfied dictates of due process clause). The court cannot agree.

This cumulative notice theory, in the context of this case, has at least two constitutional shortcomings. First, it is unrealistic to expect homeless families to link the details of shelter warnings they may have received months earlier with boxes checked off on an NFL–ST form offering no specifics. *See id.* at 268–69, 90 S.Ct. 1011 ("The opportunity to be heard must be tailored to the ... circumstances of those who are to be heard."). The deficiencies in the Commonwealth's attempt to justify its defective notice were recently recognized by Judge Hillman in a case raising identical issues:

> Even if [plaintiff] could have connected the dots that the incident described by [a third party] in [a] May 24, 2004 letter constituted the "criminal activity" alleged by [the agency] in its June 21, 2004 termination notice, it is [the agency's] burden to sufficiently notify [plaintiff] of the reasons for the decision to terminate her benefits. Allowing the [third party's] letter to supplement [the agency's] deficient notice would relieve [the agency] of its due process obligations.

*Pratt v. Hous. Auth. for City of Camden*, C.A. 05–0544(NLH), 2006 WL 2792784, at *9 (D.N.J. Sept. 27, 2006).

---

**3.** In their original memorandum in support of their motion for injunctive relief, Plaintiffs also argued that Defendant's form notices violated federal statutory law, as well as the constitution's due process clause. Because 45 C.F.R. § 205.10(a)(4) was enacted in order to implement the due process requirements set forth in *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), the statutory and constitutional analyses are coextensive and there is no need to discuss the statutory claim separately.

Second, it is clear that the DTA's non-compliance committee does not deem all shelter warnings grave enough to merit termination. For example, in Gasque's case, while she received warnings for not putting her child to bed on time and for not doing certain chores, this alleged misconduct played no part in the termination of her shelter benefit. Thus, unless the DTA's notice provides reasonable detail regarding the activity giving rise to the proposed termination, a recipient may be forced to counter every shelter warning "at the risk of missing the critical one altogether." *Barnes v. Healy*, 980 F.2d 572, 579 (9th Cir.1992) (quoting *Gray Panthers v. Schweiker*, 652 F.2d 146, 169–70 (D.C.Cir.1980)).

Defendant next focuses on Gasque's ostensible success in convincing the hearing officer that she had complied with her self-sufficiency plan. If Gasque had not been provided sufficient notice, Defendant reasons, the hearing officer would not have ruled in her favor on any issue.

This argument is unpersuasive for three reasons. First, the extent to which Gasque was prepared to assert compliance with her self-sufficiency plan appears to be the result of a pre-hearing investigation conducted by her counsel. As the Second Circuit noted in *Kapps v. Wing*, 404 F.3d 105 (2d Cir.2005),

> [A] scheme which relies on beneficiaries to seek out basic information on why the agency took the action it did will result in "only the aggressive receiv[ing] their due process right to be advised of the reasons for the proposed action.... The meek and submissive," in contrast, will "remain in the dark ...."

*Id.* at 126 (internal citation omitted).

Second, it is far from clear that Gasque actually prevailed on this issue. According to the hearing officer,

> Regulation 106 C.M.R. 309.040(E) states that one of the reasons for noncompliance is nonparticipation in the activities of [a] Self–Sufficiency Plan. In this case, [Gasque] was to save $150 in August. [Gasque] did so initially, but later took out $150 and sent it to her daughter. Because there is only one month's of savings in question, and because [Gasque's] testimony was convincing in this aspect, *this issue is not considered here.*

(Dkt. No. 22, Ex. 5, Appeal No. 310951, at 3 (emphasis added).)

Finally, even if Gasque did prevail in this skirmish, it is important to remember that she lost the war. Because the hearing officer ultimately denied Gasque's appeal on the ground that she left her three year-old daughter unattended for six hours, whether Gasque saved $150 in the month of August became inconsequential.

Based on the foregoing, it is clear that Plaintiffs, at a minimum, are entitled to some form of retrospective relief. The version of the NFL–ST Colon and Gasque received failed to provide sufficient detail regarding the particular conduct that constituted cause for ending the emergency shelter benefits. Accordingly, these forms failed to give the person terminated a fair opportunity to contest the charge. Given the grave potential consequences to persons terminated from emergency shelters, these deficiencies violated the Due Process Clause of the Fourteenth Amendment, as several courts have recognized. *See, e.g., Kapps*, 404 F.3d at 124 ("[I]n the absence of effective notice, the other due process rights afforded a benefits claimant—such as the right to a timely hearing—are rendered fundamentally hollow." (citation omitted)). Indeed, the fact that the Department revised the NFL–ST after Plaintiffs instituted this action is significant evidence that the Department it-

self recognized the constitutional flaws of the form.

Defendant asserts that if retrospective relief is warranted it must be confined, first, only to recipients of the older versions of the NFL–ST form and not the NFL–9, and second, only to those recipients whose shelter benefits were not terminated for suspected criminal activity.

In support of this first argument, Defendant notes that Colon and Gasque each received earlier versions of the NFL–ST and appended only their NFL–STs to the complaint. Defendant asserts that if Plaintiffs had wished to challenge the NFL–9 form they should have said so specifically in their complaint.

This contention elevates form over substance. The current NFL–9, like the older versions of the NFL–ST, provides nothing more than boxes and boilerplate explanations that track the regulatory standards for termination. *See Edgecomb v. Hous. Auth. of the Town of Vernon,* 824 F.Supp. 312, 315 (D.Conn.1993) (finding a notice which "merely parrots the broad language of the regulations" insufficient (citing *Billington v. Underwood,* 613 F.2d 91, 94 (5th Cir.1980))).

While Defendant correctly points out that the complaint makes no mention of the NFL–9 (and twice refers to "the form notice" used by the DTA), it clearly targets the DTA's "policy and practice" of sending form notices that merely provide the "reasons for termination set forth in 106 C.M.R. § 309.040(F)" without detail. (Dkt. No. 5, Compl.¶ 17.) Because this regulation covers the NFL–9 form, as well as the NFL–ST form, Defendant had notice that the adequacy of both forms was in play. Moreover, the constitutional analysis of the two forms is identical, and the issue is squarely before the court. Requiring Plaintiffs to amend their complaint to specifically cite the NFL–9 form when it is already covered by the complaint's general language would generate delay with no substantive justification.[4] Defendant does not, and cannot, claim surprise.

The next group of notice recipients Defendant seeks to exclude from retrospective relief are those individuals who lost their shelter benefits due to allegations that a member of their household engaged in criminal activity. According to Defendant's records, approximately twenty families received NFL–STs based on suspected criminal activity between September 1, 2005 and August 1, 2006. These families received a version of the NFL–ST strikingly similar to the current version of the NFL–9; that is, the termination notice did not "specify *who* ... violated *what* specific obligation and *when* the violation occurred." *Driver v. Hous. Auth. of Racine County,* 289 Wis.2d 727, 713 N.W.2d 670, 673 (2006) (emphasis in original). It is clear that recipients of this version of the NFL–ST received notices that failed to satisfy the dictates of due process.

As previously noted, on August 1, 2006, the DTA revised the NFL–ST, adding a space for the name of the household member who engaged in criminal activity and two spaces for the particular criminal activity in which the household member purportedly engaged. Between August 1 and October 23, 2006, five families received this version of the NFL–ST. According to Defendant, individuals armed with the facts provided by this notice had all they required to mount a challenge to their termination.

---

4. It should be noted that Plaintiffs filed a motion to amend their complaint on November 15, 2006. (*See* Dkt. No. 39, Pls.' Mot. Amend Compl. 1 (citing their intention to include, as a named plaintiff, a recent recipient of an NFL–9 termination notice).)

Although the August, 2006 revisions constitute a significant improvement, the court concludes that this version of the NFL–ST also fell short of providing the requisite notice. As Plaintiffs point out, the Department's initial NFL–ST revisions were transmitted by a field operations memorandum that neglected to instruct local office workers to provide the date of the alleged criminal activity or how it affected the health, safety, or security of anyone at the shelter. *See Pratt,* 2006 WL 2792784, at *9 (finding notice which did not provide date of misconduct at issue deprived individual of an opportunity "to prepare rebuttal evidence to introduce at her hearing or to adequately defend against the truth of [the agency's] basis for terminating her assistance").[5]

In short, the court finds that Plaintiffs are likely to prevail on their due process claim with respect to those individuals who received NFL–ST and NFL–9 termination notices from October 1, 2005 to October 23, 2006, the date of the DTA began issuing the most recent revision of the NFL–ST.

The court further finds that significant numbers of the plaintiff class, certified below, are likely to suffer irreparable harm due to their termination from emergency shelter by use of these constitutionally defective notices. In spite of a long line of cases in which the threatened termination of desperately needed public assistance benefits was deemed an immediate and irreparable harm, *see, e.g., Mass. Ass'n of Older Ams. v. Sharp,* 700 F.2d 749, 753 (1st Cir.1983), Defendant argues that the potential for irreparable harm in this case is minimal since a vast majority of the families who recently received NFL–STs no longer require emergency shelter.

This "raw numbers" argument overlooks the very real possibility that some families

in "private housing" may be residing in seriously substandard conditions and would quickly embrace the opportunity to return to a previous shelter placement. Defendant's contention also undercuts any claim of hardship to the DTA should an injunction issue. Indeed, the court finds that the balance of harms falls most heavily on the plaintiff class and that the public interest will be served by issuance of the requested relief.

Based on these findings, the court will order that all persons terminated from emergency shelters between November 30, 2005 and October 23, 2006, by use of the previous NFL–ST forms, and from November 30, 2005 to the date of this order by use of the current NFL–9 form, be contacted by Defendant at their most recent available addresses and informed that they are eligible to reapply for shelter benefits notwithstanding the customary twelve-month disqualification rule.

Should the Department choose to deny a re-application based on the misconduct that led to the issuance of the original defective notice, the DTA shall send the applicant a new notice providing a reasonably detailed description of the basis for the termination and informing the applicant of his or her right to appeal the termination determination.

### 2. *Prospective Relief.*

Plaintiffs argue that an intervention by this court is necessary to prevent that the DTA from continuing to provide individuals with insufficient notice concerning the basis for the termination of their emergency shelter benefits. They take the position that, despite Defendant's most recent modifications to the NFL–ST, the due process clause requires more. In the same vein,

---

**5.** It is also worth noting that the Department has not provided the court or Plaintiffs with

copies of these five termination notices despite Plaintiffs' request that it do so.

they argue that the continued use of the unmodified NFL–9 form would be improper.

Defendant, in contrast, contends that the current NFL–ST will afford all future recipients their constitutional rights by "specify[ing] *who* . . . violated *what* specific obligation and *when* the violation occurred." *Driver*, 713 N.W.2d at 673 (emphasis in original).

■ Because the requirements of due process vary depending upon the circumstances, the Supreme Court has embraced the framework set forth in *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), to evaluate the sufficiency of administrative procedures. *Wilkinson v. Austin*, 545 U.S. 209, 224, 125 S.Ct. 2384, 162 L.Ed.2d 174 (2005). This framework requires a court to consider three distinct factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* at 224–25, 125 S.Ct. 2384 (quoting *Mathews*, 424 U.S. at 335, 96 S.Ct. 893).

Regarding the first factor, it is difficult to overstate the significance of the private interest at stake. By definition, recipients of emergency shelter lack feasible alternative housing, and for some families, this benefit is the difference between a modicum of dignity and safety and the perils of life on the street.

The second *Matthews* factor is less straightforward. Since October 23, 2006, the DTA has issued four terminations using the revised NFL–ST form. (Dkt. No. 36, 2nd Inserra Aff. ¶ 5.) Three of these notices appear to have furnished recipients with an adequate description of the relevant termination-related events.[6] The fourth is more sketchy. This notice provided the following account of the pertinent "Incident(s) / Violation(s) and Date(s)":

> Non-compliant with activities listed in SSP plan (2 missed housing appointments) on June 9, 2006 and October 3, 2006.

(Dkt. No. 36, Ex. A, Brockton Termination Notice.) While the relative lack of detail found in this instance may turn out to be an aberration, it raises issues the court may need to address as this litigation unfolds.

That being said, the court concurs with Defendant's assessment of the administrative and fiscal burdens that would ensue if Plaintiffs' proposed additional safeguards were instituted. Ordering the Department to provide *evidence* in its possession "that leads it to believe the described violations occurred" would force the DTA to unearth and provide a level of detail prior to sending termination notices beyond what due process requires. *See Pratt*, 2006 WL 2792784, at *6 (neither the due process clause nor agency regulations requires agency to disclose "evidentiary information

---

6. (*See, e.g.*, Dkt. No. 36, Ex. D, Haverhill Termination Notice (reciting the following violations as grounds for termination pursuant to 106 C.M.R. 309.040(E)(1)(c) and 106 C.M.R. 309.040(E)(1)(e): "unauthorized overnight on 10/20/06; missed curfew on 10/2/06; did not do assigned chores on 9/18/06; suite in disarray on 10/2/06; did not meet with shelter advocate on 10/20/06; missed housing meetings on 10/11, 10/3, 9/26, 8/29 and 9/5/06; missed [illegible] program classes on 8/21, 8/30, 8/31, 8/15, week of 9/26–9/29, week of 10/2–10/6 and 10/10/2006").)

... even though it would be helpful to a participant").

■ Though a close call, the court finds that Plaintiffs have not established a likelihood of success of the merits of their constitutional claim as it pertains to the *current* NFL–ST form. Time will tell whether the new NFL–ST performs the function its predecessors failed to do. Given its previously noted concern regarding the risk of erroneous deprivation, the court will order the Department to provide Plaintiffs' counsel with appropriately redacted copies of the NFL–ST forms it issues over the course of the next ninety days. This issue may be developed further through discovery en route to an ultimate decision on the merits.

As for the NFL–9 form, the court finds that Plaintiffs have demonstrated a likelihood that the future use of this form, absent any modifications, will result in due process clause violations. The court will therefore order Defendant to revise this form in a manner consistent with the DTA's most recent revisions to the NFL–ST.

### B. *Plaintiffs' Motion for Class Certification.*

To proceed as a class action the Federal Rules of Civil Procedure require that

(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a). In addition to these prerequisites of numerosity, commonality, typicality, and adequacy, plaintiffs seeking class action status must also satisfy one of the three parts of Rule 23(b).

In this case, Plaintiffs seek certification under the second part of Rule 23(b), which provides that class certification is proper where "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed.R.Civ.P. 23(b)(2).

■ As previously discussed, the purported differences between the first and second versions of the NFL–ST and the current NFL–9 are negligible. Because the standardized termination notices at the core of this litigation are used throughout the state, it is clear that Defendant has acted on grounds generally applicable to the class and certification is proper. *See also Dionne v. Bouley,* 757 F.2d 1344, 1356 (1st Cir.1985) (when an individual claim may become moot class action may be necessary). Since all the requirements of Rule 23(a), as well as Rule 23(b)(2), are satisfied, the motion for class certification will be allowed.

### IV. *CONCLUSION*

For the reasons set forth above, the court hereby ALLOWS in part Plaintiffs' Motion for Temporary Restraining Order and/or Preliminary Injunction (Dkt. No. 6). the court orders as follows:

1. Defendant shall contact all persons terminated from emergency shelters between November 30, 2005 and October 23, 2006, by use of the previous NFL–ST forms, and from November 30, 2005 to the date of this order by use of the current NFL–9 form, at their most recent available address and inform them that they are eligible to reapply for shelter benefits notwithstanding the customary twelve-month disqualification rule.

2. Defendant shall within thirty days of this order revise the NFL–9 form in a manner consistent with the DTA's most recent revisions to the NFL–ST form.

3. Defendant shall provide Plaintiffs' counsel with appropriately redacted copies of the NFL–ST forms it issues over the course of the next ninety days.

The motion for an injunction prohibiting ongoing use of the current revised NFL–ST form is DENIED without prejudice, pending a full hearing and decision on the merits.

Plaintiffs' Motion for Certification of Class is ALLOWED (Dkt. No. 10).

The clerk will refer this case to Chief Magistrate Judge Kenneth P. Neiman for a Rule 16 conference to establish a schedule for completion of all pre-trial proceedings.

It is So Ordered.