*Karen McDonell v. Harford County Housing Agency*, No. 16, September Term, 2018, Opinion by Adkins, J.

**PRESERVATION FOR APPELLATE REVIEW – MEMORANDA AND PLEADINGS – MARYLAND RULE 8-131**: Under Maryland Rule 8-131(a), this Court may review an issue if "it plainly appears by the record to have been raised in or decided by the trial court . . . ." In her memorandum to the Circuit Court, Petitioner stated that she was provided an "unfair hearing." "Due process is concerned with fundamental fairness in the proceeding." *Calvert Cty. Planning Comm'n v. Howlin Realty Mgmt., Inc.*, 364 Md. 301, 322 (2001). Consequently, we hold that Petitioner generally raised the issue in the trial court and preserved it for our review.

**MARYLAND ADMINISTRATIVE PROCEDURE ACT – CONTESTED CASE HEARINGS**: The Maryland Administrative Procedure Act, Md. Code (1984, 2014 Repl. Vol.), §§ 10-201–226 of the State Government Article ("State Gov't"), defines a "contested case" as "a proceeding before an agency to determine . . . a right, duty, statutory entitlement, or privilege of a person." State Gov't § 10-202(d)(1). An "agency" must operate in at least two counties. *Id.* § 10-202(b)(2). The Harford County Housing Agency ("HCHA") operates in only one county, and is not an "agency" under the MD APA. Therefore, we hold that Petitioner was not entitled to a contested case hearing.

**CONSTITUTIONAL LAW – PROCEDURAL DUE PROCESS – HOUSING CHOICE VOUCHER PROGRAM – INFORMAL HEARINGS – ADEQUATE DECISION**: The HCHA is the entity responsible for administering the Housing Choice Voucher Program in Harford County, Maryland. Pursuant to the United States Constitution, any person deprived of life, liberty, or property must be afforded procedural due process. U.S. Const. amends. V, XIV. Housing vouchers are a property interest. Under *Goldberg v. Kelly*, 397 U.S. 254, 260 (1970), housing voucher recipients must receive notice, a hearing, and an adequate decision before their vouchers are terminated. Petitioner received all of these constitutional requirements. Thus, we hold that Petitioner was not deprived procedural due process.

**ADMINISTRATIVE LAW – REVIEW OF ADMINISTRATIVE DECISIONS – SUBSTANTIAL EVIDENCE REVIEW**: The HCHA need only establish, by a preponderance of the evidence, that Petitioner committed a violent act or threatened resident health, safety, or peaceable enjoyment. This is one reason her voucher was terminated. There is substantial evidence in the record from which a reasoning mind could make such a determination. Thus, we hold that the Hearing Officer's decision was supported by substantial evidence of qualifying criminal activity. We need not reach the other substantial evidence issues.

Circuit Court for Harford County
Case No.: 12-C-16-000263
Argued: October 3, 2018

IN THE COURT OF APPEALS

OF MARYLAND

No. 16

September Term, 2018

KAREN MCDONELL

v.

HARFORD COUNTY HOUSING AGENCY

Barbera, C.J.
Greene
*Adkins
McDonald
Watts
Hotten
Getty,

JJ.

Opinion by Adkins, J.

Filed: January 22, 2019

*Adkins, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Md. Constitution, Article IV, Section 3A, she also participated in the decision and adoption of this opinion.

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

To paraphrase Justice William Brennan in the landmark decision *Goldberg v. Kelly*, 397 U.S. 254, 265 (1970), public assistance programs are no mere charity. They are the very means by which we live out our creed to "promote the general Welfare, and secure the Blessings of Liberty to ourselves and our Posterity." U.S. Const. pmbl. To discontinue such aid is no small matter and has consequences well beyond the single individual for whom the assistance has been terminated. In this case, we evaluate housing voucher termination procedures and consider whether they are both adequately protective of public housing voucher recipients and limitedly burdensome on public housing officials.

Today we resolve two questions:[1] (1) whether Respondent Harford County Housing Agency ("HCHA") terminated Petitioner Karen McDonell's voucher without affording appropriate procedures under Maryland law and the United States Constitution; and (2)

---

[1] We rephrased the issues for clarity, but the following are the specific questions for which we granted review:

    (1) Did Respondent err in terminating a voucher without affording procedural due process guaranteed under federal and Maryland administrative common law?

    (2) Does a Maryland charge of second degree assault constitute "violent criminal activity" and grounds for voucher termination?

    (3) Did Respondent err in interpreting its policy to require notice within two weeks of an unplanned and unforeseen absence from the housing rented with the voucher?

    (4) Is breach of a financial obligation that had been cured adequate grounds for voucher termination?

    (5) Did Respondent err in failing to explicitly consider all relevant facts before voucher termination?

whether the HCHA's decision to terminate McDonell's voucher was supported by substantial evidence in the record.

We shall hold that the HCHA complied with procedural due process, that Maryland law required no additional process, and that the record contained substantial evidence.

## BACKGROUND

*Factual Overview and Procedural Posture*

On November 4, 2011, Karen McDonell was enrolled in the Housing Choice Voucher Program ("HCVP" or "Voucher Program," but commonly "Section 8"). The HCVP is a federally-funded housing assistance program, administered by the HCHA[2] in Harford County, Maryland. Families enrolled in the HCVP must abide by a set of guidelines, explained in detail below, or risk termination of their monthly rental assistance.

McDonell participated in the Voucher Program without issue for more than three years. In February 2015, she fell behind on her obligation to reimburse the HCHA for an overpayment and entered into a Restitution Agreement. Under the agreement, she was required to make monthly payments of $42.22. The amount of the payments was ultimately lowered because McDonell struggled to afford the first-prescribed amount. Even so, she failed to make payments in August and September of 2015.

In June 2015, McDonell was involved in an altercation involving her sister, a neighbor, and the neighbor's daughter. McDonell was found guilty on two counts of

---

[2] The department is now called the Harford County Department of Housing & Community Development. But we will refer to is as it was known at the time this action commenced.

2

second-degree assault and was incarcerated at the Harford County Detention Center. While McDonell was incarcerated, her mother twice informed the HCHA that McDonell and her family were not residing in the home: once on October 1 and once on an unknown date. During her incarceration, McDonell was allegedly denied access to her medication, and consequently, fell into a diabetic coma and was taken to Upper Chesapeake Medical Center. The HCHA was made aware of this.

McDonell was released from jail on October 15, 2015. Days after her release, McDonell's unit failed a Housing Quality Inspection due to a rodent infestation, and she was ordered to make repairs by November 10. But on November 10, McDonell was not present at the home for the reinspection.

On November 30, 2015, the HCHA sent McDonell a letter notifying her that her Housing Voucher was being terminated for the following reasons:

1. Failure to provide access to your unit for the required Housing Quality Standard (HQS) Inspection scheduled for November 10, 2015.
2. Failure to notify the Housing Agency that your family was not residing in the assisted unit. (According to the Maryland Judiciary Case Search, you were incarcerated from September 8, 2015, through October 14, 2015.)
3. On June 9, 2015, you were charged with two counts of Second Degree Assault in the District Court for Harford County. On September 8, 2015, the District Court of Harford County listed the disposition for both charges as guilty.
4. Failure to pay restitution to the Housing Agency in accordance with the restitution agreement you signed on February 5, 2015. The last payment made on your accoun[t] was October 19, 2015.

The letter also advised McDonell that her housing assistance would terminate December

3

31, 2015 and that she had the right to request an informal hearing within 14 days. McDonell requested an informal hearing, which was held on December 21, 2015. The Hearing Officer ("HO") issued a decision upholding the termination on January 6, 2016, which is excerpted at length below.

McDonell sought judicial review in the Circuit Court for Harford County. McDonell argued that: the hearing was "unfair," she never received notice of the reinspection, her mother promptly notified the HCHA of McDonell's incarceration, she was "caught up" on her restitution payments, and she was "falsely" charged with two counts of second-degree assault. The Circuit Court determined that the record contained substantial evidence to justify the HCHA's decision to terminate McDonell's voucher. The judge upheld the termination on all four grounds listed in the notice.

In an unreported decision, the Court of Special Appeals affirmed the decision of both the Circuit Court and the HO. While finding the due process issues unpreserved, the intermediate appellate court went on to hold that, even if the issue was properly before it, "the Housing Agency did not violate appellant's due process rights." It also held that "the [HCHA's] decision to terminate appellant's Housing Vouchers was supported by substantial evidence in the record and not premised upon an erroneous legal conclusion."

*HUD Regulations and the Informal Hearing Procedure*

Congress established the HCVP with the express purpose of "promot[ing] the general welfare of the Nation . . . ." 42 U.S.C. § 1437(a)(1). In doing so, Congress sought to "remedy the unsafe housing conditions" and "address the shortage of housing affordable to low-income families." *Id.* § 1437(a)(1)(A)–(B). The Voucher Program is funded by the

4

federal government, regulated and overseen by the Department of Housing and Urban Development ("HUD") and administered by state and local public housing agencies ("PHAs"). *See id.* § 1437f. Congress noted its intent to "vest in public housing agencies that perform well[] the maximum amount of responsibility and flexibility in program administration," so long as the agency is "appropriate[ly] accountab[le] to public housing residents, localities, and the general public." *Id.* § 1437(a)(1)(C).

PHAs are required to "comply with HUD regulations," issued in the Code of Federal Regulations, and "other binding program directives." 24 C.F.R. § 982.552(a). Among these is the requirement to provide individuals with the opportunity for an informal hearing when their housing vouchers have been terminated. *See id.* § 982.555. Under the regulations, a "PHA must give a participant family an opportunity for an informal hearing" to consider whether the PHA's decision is "in accordance with the law" when, *inter alia*, the PHA decides to terminate assistance: (1) due to "the [participant] family's action or failure to act," explained in 24 C.F.R. § 982.552; or (2) "because the participant family has been absent from the assisted unit for longer than the maximum period permitted under PHA policy and HUD rules." *Id.* § 982.555(a)(1)(v).

In those circumstances, the PHA "must give the family prompt written notice" of the termination of assistance. *Id.* § 982.555(c)(2). This notice must include: (1) a "brief statement" of the reasons for the termination decision; (2) a statement that the family may request an informal hearing regarding the decision; and (3) the deadline for requesting the informal hearing. *Id.* § 982.555(c)(2)(i)–(iii). Additionally, if an informal hearing is requested, it must occur before housing assistance is terminated. *Id.* § 982.555(a)(2).

5

HUD regulations also provide guidance regarding hearing procedures. Both the family and the PHA are given an opportunity to conduct discovery. The family "must be given the opportunity to examine . . . any PHA documents that are directly relevant" before the hearing. *Id.* § 982.555(e)(2)(i). Consequently, the PHA may not "rely on" any documents during the hearing that were not made "available for examination" by the family. *Id.* The PHA may also grant itself similar discovery rights in its Administrative Plan. *See id.* § 982.555(e)(2)(ii). Both the PHA and the family must also "be given the opportunity to present evidence" at the hearing and "question any witness." *Id.* § 982.555(e)(5). Families have the right to be represented "by a lawyer or other representative" at their own expense. *Id.* § 982.555(e)(3).

Informal hearings are conducted by an HO. This individual may be "any person" designated by the PHA, so long as he or she did not "approve[] the decision under review" and is not a subordinate of that person. *Id.* § 982.555(e)(4)(i). The HO must issue a written decision "stating briefly the reasons for that decision," using the "preponderance of the evidence" standard for making factual determinations. *Id.* § 982.555(e)(6). HUD guidelines explain that "the decision required by the regulation tells the participant what was decided, and the reasons for the decision." *Section 8 Housing Assistance Payments Program; Existing Housing*, 49 Fed. Reg. 12215, 12230 (March 29, 1984). Furthermore, while overly "legalistic" decisions would add little value to the process, the "decision required by the regulation must be truly informative as to the reasons for the decision." *Id.*

PHAs are also required to adopt a written Administrative Plan "that establishes local policies for administration of the [Voucher Program] in accordance with HUD regulations

and requirements." 24 C.F.R. § 982.54(a)–(b). These Administrative Plans flesh out and add to the regulatory guidance and provide more detailed procedures for informal hearings. *See id.* § 982.555(e)(1). The HO must oversee the hearing in accordance with the procedures in the PHA's Administrative Plan. *See id.* § 982.555(e)(4)(ii).

Though lengthy, the relevant portions of the HCHA Administrative Plan are largely a restatement of the informal hearing requirements included in the HUD regulations. Regarding the informal hearing decisions, the Administrative Plan states that the HO's decision must: (1) "be based solely on allowable pertinent evidence presented at the time of the informal hearing"; (2) determine "if the action, inaction, or decision of the HCHA is in accordance with HUD regulations and this plan"; and (3) include "[a] clear summary of the decision," "the reasons for the decision," and "[t]he effective date of the decision." Harford County Housing Agency, *Administrative Plan* 171 (2016) [hereinafter *Admin. Plan*]. The Administrative Plan also provides timeframes for some of the HUD requirements. *See id.* at 161, 169.

*Procedural Due Process Overview*

The Due Process Clause is the floor upon which each of the above statutes, regulations, and administrative plans rests—it prevents procedures from falling below a certain level. There are two questions at the heart of any procedural due process case. The first question considers whether due process protections should be afforded to the interest at issue. Specifically, the Fifth and Fourteenth Amendments list "life, liberty, [and] property" as protected interests. U.S. Const. amends. V, XIV. The next question is: If a protected interest is involved, what process is due? "Due process, unlike some legal rules,

is not a technical conception with a fixed content unrelated to time, place and circumstances." *Cafeteria & Restaurant Workers Union, Local 473, AFL-CIO v. McElroy*, 367 U.S. 886, 895 (1961) (internal citation omitted). Thus, appropriate process in one circumstance may not be appropriate in another.

In *Goldberg v. Kelly*, 397 U.S. 254, 260 (1970), the United States Supreme Court addressed the issue of "whether the Due Process Clause requires that [a welfare] recipient ("Kelly") be afforded an evidentiary hearing before the termination of benefits." The Court first concluded that welfare payments are a protected property interest under the Constitution. *Id.* at 262. The more difficult question was the "extent to which procedural due process must be afforded . . . ." *Id.* at 262–63. The measure of appropriate process is not static. Rather, it is a sliding scale dependent on a balancing of two interests: (a) the private interest, or "the extent to which [the recipient] may be 'condemned to suffer grievous loss'" due to the deprivation; and (b) the governmental interest, or the monetary and efficiency incentives inherent in a "summary adjudication."[3] *Id.* at 263 (internal citations omitted). Thus, the question is whether "the recipient's interest in avoiding the loss outweighs the governmental" efficiency interest. *Id.*

The Supreme Court first highlighted that it was "crucial" to consider that terminating aid to the private welfare recipient "pending resolution of a controversy over eligibility may deprive an eligible recipient of the very means by which to live while he

---

[3] In *Mathews v. Eldridge*, 424 U.S. 319 (1976), the United States Supreme Court enumerated the third consideration for determining appropriate due process procedures: the risk of erroneous deprivation via the procedures currently used. This factor was inherent in the *Goldberg* analysis, though not separately stated.

waits." *Id.* at 264. Then, while noting the government's valid interest in conserving "the fisc and administrative time and energy," Justice Brennan, writing for the Court, also pointed out that the governmental interest is served by programs that "promote the general Welfare . . . ." *Id.* at 265. These programs provide citizens with "the means to obtain essential food, clothing, housing, and medical care." *Id.* at 264.

Ultimately, the Court concluded that "[t]he stakes [were] simply too high for the welfare recipient," whose interest "clearly outweighs the State's competing concern . . . ." *Id.* at 266. Thus, a pre-termination hearing was essential "to protect a recipient against an erroneous termination of his benefits." *Id.* at 267. Specifically, the hearing must be "at a meaningful time and in a meaningful manner." *Id.* (citation omitted). The welfare recipient must have: (1) "timely access and adequate notice detailing the reasons for a proposed termination"; and (2) "an effective opportunity to defend by confronting any adverse witnesses and by presenting his own arguments and evidence orally." *Id.* at 267–68.

Regarding the decision rendered from the pre-termination hearing, the *Goldberg* Court determined that "the decisionmaker's conclusion as to the recipient's eligibility must rest solely on the legal rules and evidence adduced at the hearing." *Id.* at 271. "To demonstrate compliance with this elementary requirement, the decision maker should state the reasons for his determination and indicate the evidence he relied on, though his statement need not amount to a full opinion or even formal findings of fact and conclusions of law." *Id.* (internal citation omitted).

The underlying importance of appropriate pre-deprivation procedures and a resulting adequate decision was discussed in *Moore v. Ross*, 502 F. Supp. 543 (S.D.N.Y.

9

1980).  In *Moore*, the United States District Court for the Southern District of New York enumerated the "major purposes" of the *Goldberg* requirements, which are: (1) to "protect against arbitrary and capricious decisions"; (2) to "safeguard against a decision on *ex parte* evidence"; and (3) "perhaps most importantly[,] to facilitate judicial review by enabling a court to determine whether the decision was based upon 'an impermissible reason,' or 'no reason at all.'"  *Id.* at 555–56 (internal citations omitted).  Moreover, any statement or decision "must 'evince the [HO's] consideration of relevant factors' and make accessible 'the essential facts from which the [HO's] inferences have been drawn.'"  *Id.* at 556 (citation omitted).

We first addressed *Goldberg* as it relates to informal hearing procedures in *Walker v. Department of Housing and Community Development*, 422 Md. 80 (2011).  In *Walker*, the main issue was whether the housing voucher recipient was entitled to the more protective contested case hearing procedures under the Maryland Administrative Procedure Act ("MD APA"), as opposed to the lesser informal hearing procedures outlined in the HUD regulations and the PHA's administrative plan.  *See id.* at 82.  We concluded that, because the PHA at issue was administered directly by the State, it constituted an "agency" under the MD APA and recipients were entitled to a contested case hearing before their benefits were terminated.  *Id.* at 92.  Also relevant to the current case, we said that "the informal hearing framework set forth in [the HUD regulations] meets *Goldberg's* due process requirements."  *Id.* at 94.  We address these same procedures again today.

# DISCUSSION

## Preservation

We first discuss HCHA's contention that McDonell did not preserve her due process challenge. The Court of Special Appeals agreed with the HCHA that McDonell "failed to properly preserve all issues regarding due process" because she did not "seek judicial review of the Agency's decision on due process grounds . . . ." Ultimately, the intermediate appellate court concluded that McDonell waived her appellate rights pursuant to Maryland Rule 8-131(a).

In Maryland, generally, "the appellate court will not decide any other issue [not related to jurisdiction] unless it plainly appears by the record to have been raised in or decided by the trial court . . . ." Md. Rule 8-131(a). Nonetheless, we may still choose to decide an unraised issue "if necessary or desirable to guide the trial court or to avoid the expense and delay of another appeal." *Id.* "[T]he animating policy behind Rule 8-131(a) is to ensure fairness for the parties involved and to promote orderly judicial administration." *Jones v. State*, 379 Md. 704, 714 (2004). An appellate court must consider these "twin goals" before reviewing an unpreserved issue. *See id.* at 714–15.

McDonell filed a *pro se* memorandum in the Circuit Court for Harford County. In her memorandum, McDonell states among her reasons for appealing her voucher termination that she "was given an unfair hearing." Both the United States Supreme Court and this Court have repeatedly and consistently emphasized that the purpose underlying the procedural due process guarantee is fundamental fairness. *See Mathews v. Eldridge*, 424 U.S. 319, 343, 349 (1976) (considering the "fairness and reliability of existing

11

pretermination procedures" and stating the procedures must "assure fair consideration"); *Goldberg*, 397 U.S. at 261, 268 (referring to "constitutionally fair proceeding[s]" and what "fairness would require" in evaluating the scope of the Due Process Clause); *Calvert Cty. Planning Comm'n v. Howlin Realty Mgmt., Inc.*, 364 Md. 301, 322 (2001) (asserting that "[d]ue process is concerned with fundamental fairness in the proceeding"). Thus, McDonell, having raised generally the fairness issue, arguably preserved a due process claim.

The preservation question is a close one, but we have found cause before to review questions that were narrowly preserved but nonetheless "important." *See Johnson v. State*, 457 Md. 513, 528 (2018). And even were we to find that McDonell did not preserve the due process issue, this would still be "one of those rare instances, out of the ordinary, in which we would choose to address the issue." *Id.* First, reviewing McDonell's due process claim would work no unfair prejudice on either party. *See Jones*, 379 Md. at 714. All relevant evidence necessary for making that determination already exists in the record. Moreover, there is no indication that McDonell sought any tactical advantage by attempting to preserve her due process claim in this manner. Second, the "orderly administration of justice" militates toward reviewing the issue. *Id.* at 715. Approximately 94,000 Maryland households[4] receive some sort of federal housing assistance. *See Maryland Fact Sheet:*

---

[4] Nearly 4% of all Maryland households using the projected 2017 total number of housing units in Maryland (2,448,984) from the 2010 United States Census as a denominator. *See Annual Estimates of Housing Units for the United States, Regions, Divisions, States, and Counties: April 1, 2010 to July 1, 2017 Population Estimates*, U.S. Census Bureau (May 2018), https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?src=bkmk [archived at https://perma.cc/6CQQ-52JD].

*Federal Rental Assistance,* Ctr. on Budget & Policy Priorities (Mar. 30, 2017), https://www.cbpp.org/sites/default/files/atoms/files/4-13-11hous-MD.pdf [archived at https://perma.cc/VM93-79G4]. These Marylanders rely on housing vouchers to keep a roof over their heads and any termination of benefits inordinately threatens their wellbeing. Accordingly, it is both necessary and desirable to give PHAs more guidance regarding proper informal hearing procedures.

The HCHA uses our decision in *Board of Physician Quality Assurance v. Levitsky*, 353 Md. 188 (1999), to argue that we should refrain from addressing the due process question in this case. It argues that "questions, including [c]onstitutional issues, that could have been but were not presented to the administrative agency may not ordinarily be raised for the first time in an action for judicial review." *Id.* at 208. Ordinarily, this is true. But the present case is distinguishable from *Levitsky* in several regards. First, we cannot be sure what was "presented to the administrative agency," because there is no record of the informal hearing. Second, *Levitsky* dealt with a unique statutory scheme that is more investigatory in nature than the present arrangement. *See id.* at 205–06. Third, Levitsky, a doctor, was represented by sophisticated legal counsel. *See id.* at 207.

In light of the considerable importance of the issue, and considering that McDonell argued "fairness," a basic tenet of procedural due process, we hold that McDonell's due process claim was adequately preserved for our review.

**Procedural Arguments**

McDonell raises two main procedural arguments. First, she argues that she should have received a contested case hearing under the Maryland Administrative Procedure Act.

Second, even if she was not entitled to such a hearing, McDonell asserts her due process rights were nonetheless violated because she was deprived of adequately protective procedures. We review both arguments in turn.[5]

*Standard of Review*

Generally, we review legal determinations without deference to the views of the intermediate appellate court, trial court, or administrative agency. *See Cty. Council of Prince George's Cty. v. Zimmer Dev. Co.*, 444 Md. 490, 553 (2015). The Court's task is not to "substitute its judgment for the expertise of those persons who constitute the

---

[5] "[I]n order for an administrative agency's action properly to be before this Court (or any court) for judicial review, there generally must be a legislative grant of the right to seek judicial review." *Harvey v. Marshall*, 389 Md. 243, 273 (2005) (citations omitted). Although the Harford Country Housing Agency ("HCHA") raises no jurisdictional issue, we note that McDonell does not cite to any statute authorizing an appeal from the HCHA's decision. Nevertheless, review of this HCHA administrative decision falls within our inherent judicial authority, as explained in *Harvey*:

> In those circumstances where there is no statutory provision for judicial review, however, this Court "has consistently held that the Legislature cannot divest the courts of the inherent power they possess to review and correct actions by an administrative agency which are arbitrary, illegal, capricious or unreasonable." [*Criminal Injuries Comp. Bd. v.*] *Gould*, 273 Md. [486,] 500–01 [(1975)] (citations omitted); *see also Heaps v. Cobb,* 185 Md. 372, 379 (1945) (finding that "[c]ourts have the inherent power, through the writ of mandamus, by injunction, or otherwise, to correct abuses of discretion and arbitrary, illegal, capricious or unreasonable acts; but in exercising that power care must be taken not to interfere with the legislative prerogative or with the exercise of sound administrative discretion, where discretion is clearly conferred" (citations omitted))[.]

*Id.* at 275. *See also* Maryland Rule 7-401 *et. seq.* (for rules governing judicial review of administrative action where review is not expressly authorized by law).

14

administrative agency[.]" *United Parcel Serv., Inc. v. People's Counsel for Balt. Cty.*, 336 Md. 569, 576–77 (1994) (citations omitted). Yet, when an order or decision "involves an interpretation and application of Maryland statutory and case law," this falls within the Court's expertise and it reviews the issue without deference to the deciding body. *Nesbit v. Gov't Emps. Ins. Co.*, 382 Md. 65, 72 (2004) (citation omitted). Such is the case here, so we review the procedure afforded without deference.

*MD APA Contested Case Hearings*

The Maryland Administrative Procedure Act contested case procedures, codified at Md. Code (1984, 2014 Repl. Vol.), §§ 10-201–226 of the State Government Article ("State Gov't"), was enacted for the sometimes-competing purposes of "ensur[ing] the right of all persons to be treated in a fair and unbiased manner" and "promot[ing] prompt, effective, and efficient government." *Id.* § 10-201(1)–(2). The MD APA provides more rigorous procedural safeguards than either the HUD regulations or the HCHA Administrative Plan. Individuals involved in administrative hearings under the scope of the MD APA are entitled to contested case hearings. Significantly, these hearings provide the following protections: (1) each party may produce evidence and present and cross-examine witnesses, *id.* § 10-213(f); (2) the agency must transcribe the hearing upon request, *id.* § 10-215(a); (3) the presiding officer must maintain a comprehensive record of the proceedings, *id.* § 10-218; and (4) the presiding officer must compose an adequate final decision that includes a notification of right to judicial review, *id.* § 10-221.

McDonell argues that she, and presumably any HCVP participant facing termination of benefits, is entitled to a contested case hearing under the MD APA. The crux of

15

McDonell's argument is that because *Walker* held that voucher recipients in State-administered programs must receive contested case hearings, 422 Md. at 104, recipients in locally-administered programs should receive these hearings, as well. Additionally, McDonell maintains that failure to provide her with a contested case hearing would produce an absurd result, because those in State-administered programs would receive greater protections than those in locally-administered programs.

The HCHA responds that, as an agency operating in a single county, it falls outside the scope of the MD APA. It argues that contested case hearings only apply to proceedings before an "agency," State Gov't § 10-202(d)(1), and that under the MD APA, the HCHA is not an agency.

We believe this issue presents a relatively straightforward question of statutory interpretation. State Gov't § 10-203 provides a list of "general exclusions" from the contested case hearing procedures. One of the enumerated exceptions includes:

> (4) an officer or unit not part of a principal department of State government that: [i] is created by or pursuant to the Maryland Constitution or general or local law; [ii] operates in only 1 county; and [iii] is subject to the control of a local government or is funded wholly or partly from local funds.

*Id.* § 10-203(a)(4). Clearly, as a county governmental unit, the HCHA is not "part of a principal department of State government." Moreover, it (i) was created pursuant to local law, Harford Cty. Code § 9-188(H); (ii) operates only in Harford County, *id.* § 9-186; and (iii) is subject to the control of the County Executive, *id.* Consequently, the HCHA, and organizations like it, are excluded from the contested case hearing requirements under the terms of the MD APA.

16

Likewise, the HCHA falls outside the definition of "agency."  Under the statute, a "'contested case' means a proceeding before an **agency** to determine . . . a right, duty, statutory entitlement, or privilege of a person" that, under the Constitution, can only be "determined" once given the opportunity for a hearing.  State Gov't § 10-202(d)(1) (emphasis added).  The term "agency" means "a unit that: (i) is created by general law; (ii) operates in at least 2 counties; **and** (iii) is authorized by law to adjudicate contested cases."  *Id.* § 10-202(b)(2) (emphasis added).

As discussed, the HCHA only operates in one county: Harford County.  The Administrative Plan specifically states that the HCHA's jurisdiction includes "Harford County, Maryland" and no other location.  *Admin. Plan*, at 1.  Thus, the HCHA is not an "agency" under the statute, and a contested case hearing could never come before it.  In this way, McDonell's case markedly differs from *Walker*, in which the parties stipulated that the Department of Housing and Community Development was "a State agency to which the [MD APA] applies."  422 Md. at 92.  Based on this stipulation, we held that the HCVP participant was entitled to a contested case hearing.  *See id.* at 104.

McDonell calls the dichotomy between the MD APA covering some housing voucher recipients, but not others, "absurd,"[6] but she offers no plausible legal rationale as to why this arrangement is unlawful.  Nor do we see any.  We do not concur with

---

[6] We presume McDonell intends to assert the absurdity doctrine.  Bryan Garner and late-Justice Antonin Scalia describe the absurdity doctrine as allowing that "[a] provision may be either disregarded or judicially corrected as an error (when the correction is textually simple) if failing to do so would result in a disposition that no reasonable person could approve."  *Reading Law: The Interpretation of Legal Texts* 234 (2012).

McDonell's view of this legislation as a choice to cover some voucher recipients but not others. Rather, the General Assembly apparently chose to impose the more formal APA requirements on larger, state-wide agencies, but not on local ones. This may reflect a legislative concern that the more formal procedures required by the MD APA are too costly and inefficient for a local government to bear—certainly not an absurd rationale. The General Assembly has often demonstrated caution and restraint when imposing mandates on local government, especially those involving additional costs that are not funded by the State.

McDonell also offers a three-factor analysis, allegedly prescribed by our administrative common law that, if met, entitles a voucher recipient to a contested case hearing. She asserts that if a hearing involves disputed facts, an adverse impact to liberty or property interests, and no emergency decision is required, then MD APA contested case protections must be provided. But McDonell cites no authority to support this proposition, although the factors she highlights seem to be derived from *Goldberg*. Even assuming this is an appropriate synthesis and application of the *Goldberg* requirements, satisfying these elements would only entitle a recipient to a hearing consistent with the Constitution's due process protections, not relief under a statutory scheme from which she is plainly foreclosed.

For the above reasons, we hold that recipients in locally-administered housing voucher programs, like the one in this case, are not entitled to contested case hearings under the MD APA. This leaves unanswered the question—which we consider next—of whether the HCHA's procedures, as applied here, meet the due process guarantee.

18

*Procedural Due Process*

McDonell makes three arguments in support of her claim that she was deprived of procedural due process. First, and most easily resolved, is McDonell's assertion that the Hearing Officer's final decision failed to inform her of her right to seek judicial review. McDonell bases this argument on the MD APA requirement that agencies provide a "written statement of appeal rights." State Gov't § 10-221(b)(2). But, as we said above, the MD APA does not apply, and so this argument fails.

Next, McDonell argues that the HCHA failed to maintain an adequate record of the informal hearing. McDonell avers that whatever happened at the informal hearing is entirely unclear from the record and insists that the HCHA is required to maintain a more comprehensive accounting. Yet, McDonell cites no cases providing support for her assertion that due process requires that the hearing be recorded. Indeed, there is case law to the contrary. *See Montgomery v. Hous. Auth. of Balt. City*, 731 F. Supp. 2d 439, 442 (D. Md. 2010) ("[T]he Court has found[] no authority that the Due Process Clause requires a recorded hearing for a potential appeal."). *See also Rios v. Town of Huntington Hous. Auth.*, 853 F. Supp. 2d 330, 344 (E.D.N.Y. 2012) ("[D]istrict courts in this circuit as well as outside of this circuit have previously held that termination of housing benefits does not violate due process when the informal hearing is not recorded."). Generally, we agree with these federal decisions. Neither a recording nor a transcript is mandatory in instances when a reviewing court can determine that due process was accorded and there was substantial evidence to support the decision.

19

*Adequacy of the HO's Written Decision*

Finally, McDonell argues that the HCHA failed to issue an adequate decision in light of federal law and its own Administrative Plan. For one, McDonell asserts that the HO's decision did not contain adequate conclusions of law because the only regulation referenced was 24 C.F.R. § 982.555(f). Moreover, she alleges, the HO failed to resolve factual disputes based on the evidence presented at the hearing. Rather, she says, the decision was conclusory, merely reciting McDonell's contentions and stating summary disagreement. McDonell claims she was entitled to "meaningful" findings, not a repetition of statutory criteria. For these reasons, she maintains that the ultimate decision was inadequate, violating her right to due process. Unlike the others, this argument requires more scrutiny.

First, we address McDonell's argument, based solely upon *Turner v. Hammond*, 270 Md. 41 (1973), that the HO's findings must be "meaningful" and cannot "simply repeat statutory criteria, broad conclusory statements, or boilerplate resolution." In *Turner*, we reviewed a Zoning Board's denial of an application for a special use exemption to a zoning ordinance. In denying the exemption, the Zoning Board used a pre-printed "ordinance," simply filling in the blanks and choosing between "will" or "will not" options regarding the necessary findings. *See id.* at 45–46. We described the Zoning Board's process as "cavalier," without "findings of fact worthy of the name," and "utterly devoid of any evidence . . . ." *Id.* at 56. Zoning Board decisions, we concluded, must contain "more than a scintilla of evidence." *Id.* at 60.

A crucial difference between *Turner* and this case is that *Turner* dealt with zoning exemptions, which are reviewed at public hearings and subject to quasi-judicial action by

administrative bodies. In *Hyson v. Montgomery County Council*, 242 Md. 55, 67 (1966), we determined that parties to an "adjudicative administrative hearing" are entitled to certain procedures—analogous to MD APA contested case procedures—"when an administrative board or agency is required to hold a public hearing and to decide disputed adjudicative facts based upon evidence produced and a record made . . . ." But no public hearing is called for here. Thus, our zoning cases are inapt, as they are governed by requirements more closely aligned with contested case hearings under the MD APA than with the due process requirement of an informal hearing. Instead, we look to *Goldberg* and other cases analyzing due process requirements to determine whether the decision was adequate.

Based on our reading of *Goldberg* alone, however, it is difficult to divine the precise contours of an "adequate" decision. The Supreme Court provided little in the way of guidance, stating simply that "the decision maker should state the reasons for his determination and indicate the evidence he relied on, though his statement need not amount to a full opinion or even formal findings of fact and conclusions of law." *Goldberg*, 397 U.S. at 271 (internal citations omitted). Since then, some federal appellate decisions involving Section 8 tenants have recognized the right to due process, but declined to address the specifics of what process is required—simply remanding to the federal trial courts "to determine what process may be due." *Holbrook v. Pitt*, 643 F.2d 1261, 1279–80 (7th Cir. 1981).

In a leading case, *Escalera v. New York City Housing Authority*, 425 F.2d 853, 867 (2d Cir. 1970), the Second Circuit ruled that the plaintiffs' allegations of insufficient process, if proven, were sufficient to entitle them to relief, but gave little instruction about standards to be applied on remand.

21

> The minimum procedural requirements of due process under the Fourteenth Amendment must reflect the balance between the government's interest in efficient administration and the nature of the individual's interest being affected by governmental action. We hold only that granting every favorable inference to plaintiffs' complaints and affidavits, it appears that the [Housing Authority's] procedures are deficient in several specific aspects. Upon trial, the [Housing Authority] may be able to show great need for expedited procedures, or the plaintiffs may fail to substantiate all of their allegations. Therefore the fashioning of a remedy or a declaratory judgment must await the full trial of these actions.

*Id.* Recognizing but declining to elaborate on the procedural due process rights of Section 8 tenants, the Court reasoned that the competing governmental and private interests "[had] not been fully developed at the trial level . . . ." *Id.* at 861 (citations omitted). Thus, it would not have been "appropriate for [the] court to prescribe the minimum necessary procedural requirements." *Id.*

In a similar vein, the Seventh Circuit, after recognizing an entitlement to retroactive housing payments, remanded to the district court "to determine what process may be due." *Holbrook*, 643 F.2d at 1279–80. It explained: "Due process does not have a fixed content unrelated to time, place and circumstances." *Id.* The Court relied on the Supreme Court's language in *Greenholtz v. Inmates of Nebraska Penal and Correctional Complex,* 442 U.S. 1, 13 (1979), providing that:

> The function of the legal process, as that concept is embodied in the Constitution, and in the realm of factfinding, is to minimize the risk of erroneous decisions. Because of the broad spectrum of concerns to which the term must apply, flexibility is necessary to gear the process to the particular need; the quantum and quality of the process due in a particular situation depend upon the need to serve the purpose of minimizing the risk of error.

*Id.* at 1280.[7] With the federal appellate judges deferring to their colleagues at the trial level to measure constitutional adequacy, we have fewer reported cases to consider regarding the particulars of informal hearings.

We find the Federal District Court's decision in *Moore v. Ross*, 502 F. Supp. 543 (S.D.N.Y. 1980), somewhat instructive. *Moore* spelled out the "main purposes" of the *Goldberg* hearing requirements—to guard against arbitrary and capricious decision making, to ensure any decision is not based on *ex parte* evidence, and to provide a record on review that allows a court to understand the decision maker's reasoning. *See id.* at 555–56. The crux of McDonell's argument is that the HO's decision lacks sufficient detail to ensure these purposes were achieved.

---

[7] *Caulder v. Durham Housing Authority*, 433 F.2d. 998, 1004 (4th Cir. 1970), summarizes the tenant's due process rights as follows:

> Succinctly stated, *Goldberg* requires (1) timely and adequate notice detailing the reasons for a proposed termination, (2) an opportunity on the part of the tenant to confront and cross-examine adverse witnesses, (3) the right of a tenant to be represented by counsel, provided by him to delineate the issues, present the factual contentions in an orderly manner, conduct cross-examination and generally to safeguard his interests, (4) a decision, based on evidence adduced at the hearing, in which the reasons for decision and the evidence relied on are set forth, and (5) an impartial decision maker. We refer to *Goldberg* and *Escalera* [*v. New York City Housing Authority*, 425 F.2d 853 (2d Cir. 1970),] for further elaboration of these requirements.

*Id.*

A few other cases also help give shape to our notion of what might render a decision adequate. Decisions also may not stand when the evidence supporting them "consists entirely of hearsay," *Sanders v. Sellers-Earnest*, 768 F. Supp. 2d 1180, 1186–88 (M.D. Fla. 2010), even though the rules of evidence are not formally followed during the hearings, *see* 24 C.F.R. § 982.555(e)(5). But, like other administrative proceedings, "[a]s long as it is relevant and material, the utilization of hearsay evidence . . . is well grounded." *Robinson v. D.C. Hous. Auth.*, 660 F. Supp. 2d 6, 12 (D.D.C. 2009) (involving termination from Section 8 voucher program). *See also Johnson v. United States*, 628 F.2d 187, 190–91 (D.C. Cir. 1980) (hearsay statements are considered highly probative when declarants are disinterested witnesses, their statements are essentially consistent, and counsel had access to the statements prior to agency hearing). Also crucial to due process in a termination of housing benefits is that the decision be based on the same reasons provided to the tenant before the hearing. *See Chase v. Binghamton Hous. Auth.*, 91 A.D.2d 1147, 1148 (N.Y. App. Div. 1983).

More relevant to this case, the HO's decision must respond, in some fashion, to the evidence presented at the hearing. In *Carter v. Lynn Housing Authority*, 880 N.E.2d 778 (Mass. 2008), the Massachusetts Supreme Judicial Court held that a decision fell short in that regard. "[T]he thrust of the testimony of the plaintiff's witness was to the effect that the plaintiff was not responsible for the 'waste'" committed on the property, but the HO "made no findings" as to the waste issue. *Id.* at 785. Rather, the decision "simply summarized what the plaintiff and her witnesses testified to without any indication whether he credited their testimony[.]" *Id.* Again, in *Long v. District of Columbia Housing*

*Authority*, 166 F. Supp. 3d 16, 35 (D.D.C. 2016), the court recognized that it is generally necessary for the Hearing Officer to reference evidence in the record.[8] We embrace these cases and hold that the HO must acknowledge key or disputed evidence in the record and provide some minimal assessment of it.

The HO is also required to cite an adequate legal basis for his or her decision. This basis should give the recipient an accounting of which regulations were allegedly violated and some explanation as to how he or she failed to meet the requirements of each regulation. *Compare id.* (Hearing Officer provided a legal basis when he quoted the statute), *with Driver v. Hous. Auth. of Racine Cty.*, 713 N.W.2d 670, 677–78 (Wis. Ct. App. 2006) ("[The decisions were] deficient for the absence of any legal rationale. They cite no policy, regulation, or other authority indicating what a 'family obligation' is or how the plaintiffs' acts or omissions fail to meet the pertinent legal requirements.").

In *Edgecomb v. Housing Authority of the Town of Vernon*, 824 F. Supp. 312 (D. Conn. 1993), the United States District Court for the District of Connecticut utilized both the above rationales to cast doubt on the sufficiency of the HO's decision. There, the HO terminated a recipient's voucher because "a family member" was accused of engaging in drug-related criminal activity. The HO's decision provided flatly that "there was a preponderance of evidence that indicated that a Family member did engage in such drug related activity while on the Section 8 Program, which is a violation of 24 C.F.R.

---

[8] *Long v. District of Columbia Housing Authority*, 166 F. Supp. 3d 16 (D.D.C. 2016), is an exception to the stated rule because the key piece of evidence was never disputed by either party.

882.118 . . . ." *Id.* at 316. The reviewing court determined that such a statement "must be considered insufficient" because it "did not state the elements of fact or law on which the decision to uphold the termination of assistance was based." *Id.* Moreover, the HO did not "specify the reasons for her determination or indicate the evidence on which it rested." *Id.* Therefore, the informal hearing decision did not meet *Goldberg's* minimal dictates.

Additionally, the HO's decision cannot be so "conclusory" as to make it inadequate. In *Driver*, 713 N.W.2d at 677, the Wisconsin Court of Appeals determined that an informal hearing decision was conclusory and a violation of the plaintiff's due process rights. In the court's words, the decision "[fell] appallingly short of the mark," and (1) "contain[ed] no facts related to the incidents giving rise to the termination decisions"; (2) "[did] not mention any specific evidence the hearing officers relied on"; and (3) "[did] not state the elements of law motivating the court's conclusion." *Id.* These shortcomings resulted in a conclusory and, therefore, constitutionally inadequate decision.

To review, although a decision need not "amount to a full opinion," *Goldberg*, 397 U.S. at 271, at the very least, such decision should depend on reliable evidence presented at the informal hearing, respond to that evidence sufficiently, cite a legal basis for the actions taken, and do so in enough detail as not to be conclusory.

Here, the Hearing Officer's January 6, 2016 decision consists of approximately one and one-third of a page. A significant portion of that is a repetition of the November 30, 2015 Notice of Termination. The remainder of the decision is stated in full below:

> Access was given to the unit for the Housing Agency to perform the [Housing Quality Standards] inspection. The inspection was completed, but the unit failed to pass the

26

> inspection. Restitution is currently paid up to date, although letters were presented from the Housing Agency Accounting Department showing numerous late pays during the term of the Restitution Agreement. Evidence was presented that notification did occur regarding the family not residing in the unit during the term of incarceration, however, this notification was not within the time requirements given by the Housing Agency. Evidence was presented that you were a victim of the assault and not the aggressor, however, it was not refuted that the incarceration did occur per a court order. You testified that you are working to have the charges overturned through the court system, but at this time, your record shows that you have been found guilty by the courts.
>
> A determination must be made based on the evidence presented at the Hearing. In this case, it is found that you have violated the rules and regulations of the Program, and the termination is upheld. You may apply for services again once the waiting list has been reopened. If you apply and are selected, the outcome of your conviction appeal may be taken into consideration.

Applying the *Goldberg* formulation, we first examine the types of evidence on which the HO relied. There is no reason to believe that the HO relied on any inappropriate evidence—e.g., *ex parte* evidence, etc.—in his decision. Nor does McDonell claim to the contrary. So, we examine whether the HO appropriately considered and responded to the evidence presented at the hearing.

"[T]he decisionmaker's conclusion as to the recipient's eligibility must rest solely on the legal rules and evidence adduced at the hearing." *Goldberg*, 397 U.S. at 271. The HO's decision contains few explicit references to evidence presented during the hearing, but it does contain some. Specifically noted are "letters presented from the [HCHA] Accounting Department," McDonell's testimony that she "was working to have the

27

[assault] charges overturned," and a general allusion to McDonell's "record" showing that she "[had] been found guilty by the courts."[9]

Some aspects of the decision fall short. One example is the HO's discussion of whether McDonell provided adequate notice to the HCHA regarding her family's absence from the unit. The HO states that "[e]vidence was presented that notification did occur regarding the family not residing in the unit during the term of incarceration . . . ." Yet, he concludes that "this notification was not within the time requirements given by the Housing Agency." The record reveals that McDonell's mother called twice—one message dated and the other undated—to notify the HCHA of McDonell's absence. Yet we cannot tell from the written decision why the HO concluded there was insufficient notice. Accordingly, if the lack of notice of McDonell's absence from the unit were the *only* grounds for termination, we would be loath to uphold the decision.

But there is more. The HO also grounded his decision on evidence that McDonell was convicted of assault.[10] The written decision informed McDonell that her participation in the HCVP was terminated because, among other reasons, "[she was] charged with two counts of Second Degree Assault in the District Court for Harford County" and that the "disposition for both charges [was] guilty." The decision provides the exact dates for both above instances. Moreover, the HO did not ignore McDonell's claim that she "was the

---

[9] These same records show that the prosecutor entered a *nolle prosequi* with respect to the charges made by McDonell against the neighbor.

[10] A copy of the docket entries from McDonell's District Court trial is included in the administrative record, showing that McDonell pled "not guilty," but was found guilty by the District Court.

victim of the assault and not the aggressor," or that she "testified that [she was] working to have the charges overturned." The HO paired each piece of evidence back-to-back, intimating that they were weighed against each other. In the end, though, the HO chose to rely on McDonell's criminal conviction in the District Court and uphold termination.

The HCHA Administrative Plan sets forth that the types of credible evidence to be weighed include "evidence obtained from police and/or court records." *Admin. Plan*, at 162. Although some information from these sources no doubt would be unreliable or inconclusive, we see no logic in rejecting a judicial verdict of guilt as legitimate grounds for the HO to decide that the assault occurred. In her District Court trial, the State was required to prove McDonell's guilt beyond a reasonable doubt and the panoply of rights accorded criminal defendants was accorded her. The administrative record contains the docket entries, which reflect that McDonell was represented by counsel and entered a plea of Not Guilty.

We are not persuaded otherwise by McDonell's exercise of her right to a *de novo* appeal to the Circuit Court pursuant to Md. Code (1974, 1982 Repl. Vol.), § 12-401 of the Courts and Judicial Proceedings Article, or the subsequent decision by the Circuit Court to vacate the judgment in favor of entering a verdict of probation before judgment.[11] The HO was required to decide whether McDonell committed the assault based on a preponderance

---

[11] McDonell's attorney represented to the Circuit Court for Harford County that the guilty verdict was later vacated and the probation before judgment ("PBJ") entered in lieu thereof. But the entry of the PBJ could only occur after the Circuit Court either found the defendant guilty or accepted a guilty plea or a plea of nolo contendere. *See* Md. Code (2001, 2008 Repl. Vol.), § 6-220(b) of the Criminal Procedure Article.

of the evidence presented to him at the time of the informal hearing. Evidently, the HO was persuaded that McDonell committed the acts underlying the criminal conviction.

The HO was not required to defer his decision until after McDonell exhausted her appeal. To hold otherwise would unjustifiably delay prompt and efficient administration of the Voucher Program—not just in this case, but in the potentially countless other cases in which a criminal conviction is a ground for termination. With McDonell's assault conviction as the foundation for the HO's decision, we conclude both that the written decision is adequate, and that due process does not require a recording or transcript of the informal hearing.[12]

**Legal Grounds For Termination**

A separate question remains—whether the assault conviction or McDonell's underlying actions afforded an appropriate legal basis for termination from the program.

---

[12] McDonell also avers that the hearing Officer ("HO") should have cited the legal foundation for each of the alleged voucher program violations. The HO's decision lists the four allegations for which McDonell's housing voucher was terminated: (1) failure to provide access to her unit, (2) failure to notify HCHA her family was not residing in the unit, (3) the two charged counts of second-degree assault, and (4) failure to pay restitution. Before a recipient receives her voucher, she must attend a "briefing" during which the recipient is informed about the voucher program and the reasons a family's assistance could be terminated. *See* Harford County Housing Agency, *Administrative Plan* 102–04 (2016). The recipient is thus aware of the voucher program requirements, even though she might not necessarily be familiar with specific federal regulations at play. McDonell affirmed that she received such a briefing, as indicated by her various signatures on the "Program Regulation Sheet." The informal list of suspected violations provided a sufficient legal basis for the action taken in this circumstance, as it allowed for sufficient notice regarding the regulations alleged to have been violated and, thus, protection against misapplication of the law.

We start with the regulatory law that termination from the program is permissible even if only one of the charges is sustained. *See* 24 C.F.R. § 982.552(c)(1).

*Substantial Evidence Arguments*

We granted *certiorari* on several questions that revolve around whether the record contains substantial evidence to support termination for a given offense. "[T]he PHA may at any time . . . terminate program assistance for a participant[] for ***any***" of the allowable grounds under the regulation. 24 C.F.R. § 982.552(c)(1) (emphasis added). Thus, in our due process review, if we find that any of the HCHA's stated grounds for termination are supported by substantial evidence, we need not consider the others.

The inherent power of judicial review of administrative decisions is extremely limited. *See Harvey v. Marshall*, 389 Md. 243, 277 (2005). The purpose of our review here is to determine if the action of the HCHA was "arbitrary, illegal, capricious or unreasonable." *Id.* at 280. *See also Dep't of Natural Res. v. Linchester Sand & Gravel Corp.*, 274 Md. 211, 222–28 (1975). Even without a statutorily defined standard of review, the substantial evidence test has been followed. *See Harvey*, 389 Md. at 256 (citing cases).[13] *See also Moore v. Ross*, 502 F. Supp. 543, 552 (S.D.N.Y. 1980) ("The question of substantial evidence is relevant to our inquiry because governmental determinations unsupported by substantial evidence may constitute irrational action and thus a denial of due process.").

---

[13] *See also* Maryland Rule 7-401 *et seq.* (rules of procedure governing cases without statutorily authorized appeal).

31

This substantial evidence test is familiar as we normally apply the standard in review of administrative decisions when review *is* authorized by statute. *See, e.g.*, *Dickinson-Tidewater, Inc. v. Supervisor of Assessments of Anne Arundel Cty.*, 273 Md. 245, 256 (1974) (the substantial evidence test, which the courts use when acting pursuant to the inherent ability to review administrative decisions, "is similar to the tests laid down by [the APA]"); *Baker v. Bd. of Trs. of Emps. Ret. Sys. of City of Balt.*, 269 Md. 740, 744 (1973) (applying substantial evidence standard in case without legislative authorization to appeal); *Hurl v. Bd. of Educ. of Howard Cty.*, 107 Md. App. 286, 305 (1995) ("[T]he standards of judicial review of agency decisions are essentially the same whether proceeding under the APA or pursuant to our inherent power to review administrative actions.").

Review under the test "is limited to determining if there is substantial evidence in the record as a whole to support the agency's findings and conclusions, and to determine if the administrative decision is premised upon an erroneous conclusion of law." *United Parcel Serv., Inc. v. People's Counsel for Balt. Cty.*, 336 Md. 569, 577 (1994). Administrative decisions must not be "arbitrary, capricious, or unreasonable"—there must be "substantial evidence from which the Board could have reasonably found" as it did. *Baker*, 269 Md. at 744. In other words, there must be "more than a mere scintilla" of evidence. *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted).

A reviewing court "may not uphold the agency order unless it is sustainable on the agency's findings and for the reasons stated by the agency." *United Parcel Serv.*, 336 Md. at 577 (citation omitted). We "look through" the circuit court decision to the informal

hearing and may reverse if we find that the HO's decision is not supported by substantial evidence. *See Elms v. Renewal by Andersen*, 439 Md. 381, 391 (2014).

*Violent or Otherwise Threatening Criminal Activity*

Applying these principles, we consider whether substantial evidence in the record supports termination for engaging in violent criminal activity. McDonell argues that second-degree assault does not constitute "violent criminal activity" to warrant voucher termination. She points to HUD's definition of "violent criminal activity" as a crime with one of its elements being the use or threatened use of force "substantial enough to cause . . . serious bodily injury or property damage," 24 C.F.R. § 5.100, and states that second-degree assault does not have a serious bodily injury requirement as one of its elements. Finally, McDonell argues that the HCHA abused its discretion by "ignoring" HUD guidelines that allow PHAs to consider "other relevant circumstance" in termination decisions.[14]

The HCHA responds that McDonell's reading of the HUD regulations is too limiting. Rather, they say that an agency may terminate a voucher if it finds, by a preponderance of the evidence, that "the family has been engaged in criminal activity or alcohol abuse as described in [24 C.F.R.] § 982.553," regardless of conviction.

Both parties recognize that criminal activity, generally, is an acceptable ground upon which the HCHA may terminate assistance, as specified in 24 CFR

---

[14] We fully agree with the Court of Special Appeals' conclusion that the Department of Housing and Urban Development ("HUD") regulations and HCHA Administrative Plan clearly demonstrate that this consideration is discretionary, not mandatory. Therefore, we reject this argument.

§ 982.552(c)(1)(xi), which alludes to the definition provided in § 982.553.[15]  Yet, under § 982.553, "violent" criminal activity is not the only criminal activity for which a voucher can be terminated.  HUD regulations identify three categories of criminal activity for which termination is appropriate: "drug criminals," "alcohol abusers," and "other criminals" as described in 24 C.F.R. § 982.551.  *Id.* § 982.553(b)(1)–(3).  "Other criminals" includes "violent" criminals **and** those engaged in "criminal activity that threatens the health, safety, or right to peaceful enjoyment of other residents" and neighbors.  *Id.* § 982.551(*l*).  Thus, the PHA may terminate program assistance if it finds, by a preponderance of the evidence, "that any household member has violated" either obligation.  *Id.* § 982.553(b)(2).  The PHA makes this determination based on standards established in its Administrative Plan.  *See id.*  The preponderance standard requires that the alleged acts are "more probable than not" to have occurred, as judged by the "greater weight of all evidence."  *Id.*

With this standard in mind, we evaluate whether the record contained substantial evidence for the HCHA to determine, by a preponderance of the evidence, that McDonell's alleged conduct was violent or threatening to health, safety, or peaceful enjoyment.  The assault charges stem from an incident involving McDonell, her sister, a neighbor, and the neighbor's daughter.  We have no transcript of testimony—from either the District Court trial or the HCHA informal hearing—and rely largely on the dual Applications For

---

[15] Indeed, McDonell was given adequate notice as to these duties and regulations. On November 9, 2015 and October 16, 2014, McDonell signed a notice providing that the "use, attempted use, or threatened use of physical force against any person" is prohibited, and if "enough evidence exists" to prove a family member's involvement in such an activity—"regardless of whether they have been convicted"—her voucher could be terminated.

Statement of Charges—one filed by Joann Douglas against McDonell, and the other filed by McDonell against Douglas. As McDonell describes the events, she was leaving the HCHA property to run errands with her sister when the neighbor and her daughter attacked them. During the altercation, the neighbor and her daughter physically injured both McDonell and her sister and damaged their personal property. Also, in a "Tenant Complaint Form," submitted after her incarceration, McDonell asserts that the neighbor "assaulted" her again on two separate occasions.[16]

The neighbor, in her Application for Statement of Charges, describes the events differently. She reported that McDonell initiated the confrontation by directing "racial slurs" at her and her daughter, and then drove with her sister to the neighbor's home to continue to harass her. Allegedly, McDonell exited her car and attempted to punch the neighbor multiple times, ultimately striking her on the shoulder. The daughter and sister also allegedly began to fight. The neighbor also claims that McDonell pulled out her daughter's braids and scratched her face. When the altercation ended, the neighbor called the police. The record includes photographs of the daughter's alleged injuries.

On June 8, 2015, the day of the assault, McDonell pressed charges against her neighbor. On June 11, the neighbor also pressed charges against McDonell for two counts of second-degree assault. Although the State dismissed all charges against the neighbor on August 10, it pursued them against McDonell, and after a September 9 trial, McDonell was found guilty on both charges. McDonell's sister was also found guilty of second-degree

---

[16] It is unclear from the record provided what, if anything, became of this complaint.

35

assault.[17] The record demonstrates that McDonell appealed her convictions on December 16, 2015, but the judge ordered that the "terms or conditions of probation not be stayed." There is no indication as to the result of the appeal.

All the above was in the record before the HO during the informal hearing, as well as McDonell's conviction. The HO noted some of these facts in his decision, as described above. The HCHA was not required to prove guilt beyond a reasonable doubt. Instead, the HCHA need only establish, by a preponderance of the evidence, that McDonell committed the violent act or threatened resident health, safety, or peaceable enjoyment for which her voucher was terminated. We concluded earlier that the HO did not ignore McDonell's claim that she "was the victim of the assault and not the aggressor," or that she "testified that [she was] working to have the charges overturned," but decided to rely on the conviction itself to tip the scales. A reviewing court "must review the agency's decision in the light most favorable to it; the agency's decision is prima facie correct and presumed valid and it is the agency's province to resolve conflicting evidence . . . ." *Marzullo v. Kahl*, 366 Md. 158 (2001) (cleaned up). Applying the substantial evidence standard as required by due process, we conclude that a reasoning mind could have reached the factual conclusion the agency reached—that McDonell attacked or threatened the health, safety, or peace of the neighbor and her daughter. For this reason, we uphold the HCHA's decision to terminate McDonell's voucher.

---

[17] Later, McDonell received Temporary Peace Orders against the neighbor and her daughter, effective until December 9, 2015—a duration of approximately six months.

**SUMMARY**

In sum, we hold that the HCHA is not an "agency" for the purposes of the MD APA, and therefore, McDonell is not entitled to a contested case hearing. McDonell was entitled to due process, which she was accorded by the HCHA through the informal hearing and written decision. The HCHA provided adequate notice before the hearing, and was not required to include notice of her right to appeal. She was not entitled to a transcript of the informal hearing. The Hearing Officer's decision was supported by substantial evidence of qualifying criminal activity. We need not reach the other substantial evidence issues because the above-enumerated reasons are sufficient to uphold the HCHA's decision to terminate McDonell's housing voucher. We reverse the Court of Special Appeals as to its holding that McDonell's due process claim was not adequately preserved. We affirm the intermediate appellate court on Petitioner's substantive issues, although, as explained, on somewhat different grounds.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED IN PART AND AFFIRMED IN PART. COSTS TO BE PAID BY PETITIONER.**